## IN THE MATTER OF MARY HALL.

The statute (Revision of 1875, p. 44, sec. 29,) provides that the Superior Court "may admit as attorneys such persons as are qualified therefor agreeably to the rules established by the judges of said court." This statute has come down, with some changes, from the year 1750, and in essentially its present form, from the year 1821. Held that under it a woman could be admitted as an attorney.

APPLICATION to the Superior Court in Hartford County for admission as an attorney, reserved for the advice of this court.

*J. Hooker* and *T. McManus*, for the applicant.

*G. Collier*, contra.*

PARK, C. J. This is an application by a woman for admission to the bar of Hartford county. After having completed the prescribed term of study she has passed the examination required by the rules of the bar and has been recommended by the bar of the county to the Superior Court for admission, subject to the opinion of the court upon the question whether as a woman she can legally be admitted. The Superior Court has reserved the case for our advice.

The statute with regard to the admission of attorneys by the court is the 29th section of chapter 3, title 4, of the General Statutes, and is in the following words:—" The Superior Court may admit and cause to be sworn as attorneys such persons as are qualified therefor agreeably to the rules established by the judges of said court; and no other person than an attorney so admitted shall plead at the bar of any court of this state, except in his own cause."

---

* The bar of the county voted to recommend the admission of the applicant subject to the opinion of the court whether, as a woman, she could be legally admitted, and appointed Messrs. McManus and Collier to argue the case before the court.

It is not contended, in opposition to the application, that the language of this statute is not comprehensive enough to include women, but the claim is that at the time it was passed its application to women was not thought of, while the fact that women have never been admitted as attorneys, either by the English courts or by any of the courts of this country, had established a common-law disability, which could be removed only by a statute intended to have that effect.

It is hardly necessary to consider how far the fact that women have never pursued a particular profession or occupied a particular official position, to the pursuit or occupancy of which some govermental license or authority was necessary, constitutes a common-law disability for receiving such license or authority, because here the statute is ample for removing that disability if we can construe it as applying to women; so that we come back to the question whether we are by construction to limit the application of the statute to men alone, by reason of the fact that in its original enactment its application to women was not intended by the legislators that enacted it. And upon this point we remark, in the first place, that an inquiry of this sort involves very serious difficulties. No one would doubt that a statute passed at this time in the same words would be sufficient to authorize the admission of women to the bar, because it is now a common fact and presumably in the minds of legislators, that women in different parts of the country are and for some time have been following the profession of law. But if we hold that the construction of the statute is to be determined by the admitted fact that its application to women was not in the minds of the legislators when it was passed, where shall we draw the line? All progress in social matters is gradual. We pass almost imperceptibly from a state of public opinion that utterly condemns some course of action to one that strongly approves it. At what point in the history of this change shall we regard a statute, the construction of which is to be affected by it, as passed in contemplation of it? When the statute

we are now considering was passed it probably never entered the mind of a single member of the legislature that black men would ever be seeking for admission under it. Shall we now hold that it cannot apply to black men? We know of no distinction in respect to this rule between the case of a statute and that of a constitutional provision. When our state constitution was adopted in 1818 it was provided in it that every elector should be "eligible to any office in the state" except where otherwise provided in the constitution. It is clear that the convention that framed, and probably all the people who voted to adopt the constitution, had no idea that black men would ever be electors, and contemplated only white men as within any possible application of the provision, for the same constitution provided that only white men should be electors. But now that black men are made electors, will it do to say that they are not entitled to the full rights of electors in respect to holding office, because an application of the provision to them was never thought of when it was adopted? Events that gave rise to enactments may always be considered in construing them. This is little more than the familiar rule that in construing a statute we always inquire what particular mischief it was designed to remedy. Thus the Supreme Court of the United States has held that in construing the recent amendments of the federal constitution, although they are general in their terms, it is to be considered that they were passed with reference to the exigencies growing out of the emancipation of the slaves, and for the purpose of benefiting the blacks. *Slaughter House Cases*, 16 Wall., 67; *Strauder* v. *West Virginia*, 100 U. S. Reps., 306. But this statute was not passed for the purpose of benefiting men as distinguished from women. It grew out of no exigency caused by the relation of the sexes. Its object was wholly to secure the orderly trial of causes and the better administration of justice. Indeed the preamble to the first statute providing for the admission of attorneys, states its object to be "for the well-ordering of proceedings and pleas at the bar."

The statute on this subject was not originally passed in its present form. The first act with regard to the admission of attorneys was that of 1708, which was as follows:— " That no person, except in his own cause, shall be admitted to make any plea at the bar without being first approved by the court before whom the plea is to be made, nor until he shall take in the said court the following oath," etc. Col. Records, 1706 to 1716, p. 48. This act seems to have contemplated an approval by the court in each particular case in which an attorney appeared before it. The first act with regard to the general admission of attorneys appears in the revision of 1750, and is as follows:—" That the county courts of the respective counties in this colony shall appoint, and they are hereby empowered to approve, nominate and appoint attorneys in their respective counties, as there shall be occasion, to plead at the bar; * * and that no person, except in his own case, shall make any plea at the bar in any court but such as are allowed and qualified attorneys as aforesaid." Thus the statute stood until the revision of 1821, when for the first time it took essentially its present form. Up to this time the word " person " had been used in this statute only in the clause that " no person " should be allowed to practice before the courts except where formally admitted by the court, a use of the word which of course could not be regarded as limited to the male sex, as women would undoubtedly have been held to be included in the term. The language of the statute as now adopted was as follows:—" The county courts may make such rules and regulations as to them shall seem proper relative to the admission and practice of attorneys; and may approve of, admit and cause to be sworn as attorneys, such persons as are qualified therefor agreeably to the rules established; * * and no person not thus admitted, except in his own cause, shall be admitted or allowed to plead at the bar of any court." The statute in this form passed through the compilations of 1835 and 1838, the revision of 1849 and the compilation of 1854, and appears with a slight modification in the revision of 1866. The

county courts had now been abolished, and the power to admit attorneys, as well as to make rules on the subject, had been given to the Superior Court; the expression "such persons" being preserved, and the provision that "no person" not thus admitted should be allowed to plead, being omitted.

The statute finally took its present form in the revision of 1875. It retains the provision that the Superior Court may make rules for the admission of attorneys, and provides that the court "may admit and cause to be sworn as attorneys such persons as are qualified therefor agreeably to the rules established," and restores the provision, dropped in the revision of 1866, that "no person other than an attorney so admitted shall plead at the bar of any court in this state, except in his own cause."

These changes, though not such as to affect the meaning of the statute at any point of importance to the present question, are yet not wholly without importance. The adoption by the legislature of a revision of the statutes becomes, both in law and in fact, a re-enactment of the whole body of statutes; and though in determining the meaning of a statute we are not to regard it as then enacted for the first time, especially if there be no change in phraseology, yet where there is such a change, it follows that the attention of the revisers had been particularly directed to that statute, as of course also that of the legislature, and that with the changes made it expresses the present intent of both. Thus in this case it is clear that the revisers gave particular thought to the phraseology of the statute we are considering, and put it in a form that seemed to them best with reference to the present state of things, and decided to leave the words "such persons" to stand, with full knowledge that they were sufficient to include women, and that women were already following the profession of law in different parts of the country. The legislators must be presumed to have acted with the same consideration and knowledge. It would have been perfectly easy, if either should have thought best, to insert some words of limitation

or exclusion, but it was not done. Not only so, but a clause omitted in the revision of 1866 was restored, providing that no "person" not regularly admitted should act as an attorney—a term which necessarily included women, and the insertion of which made it necessary, if the word "persons" as used in the first part of the statute should be held not to include women, to give two entirely different meanings to the same word where occurring twice in the same statute and with regard to the same subject matter.

The object of a revision of the statutes is, that there may be such changes made in them as the changes in political and social matters may demand, and where no changes are made it is to be presumed that the legislature is satisfied with it in its present form. And where some changes are made in a particular statute, and other parts of it are left unchanged, there is the more reason for the inference, from this evidence that the matter of changing the statute was especially considered, that the parts unchanged express the legislative will of to-day, rather than that of perhaps a hundred years ago, when it was originally enacted.

But this statute, in the revision of 1875, is placed immediately after another with regard to the appointment of commissioners of the Superior Court, the necessary construction of which, we think, throws light upon the construction of the statute in question. That act was passed in 1855, after women had begun, with general acceptance, to occupy a greatly enlarged field of industry, and some professional and even public positions; and it has been held by the Superior Court, very properly, we think, as applying to women, a woman having three years ago been appointed a commissioner under it. Its language is as follows:—" The Superior Court in any county may appoint any number of persons in such county to be commissioners of the Superior Court, who, when sworn, may sign writs and subpœnas, take recognizances, administer oaths and take depositions and the acknowledgment of deeds, and shall hold office for two years from their appointment." Here the very language is used which is used in the statute

with regard to attorneys. In one it is, "any number of persons," in the other, "such persons as are qualified." These two statutes are placed in immediate juxtaposition in the revision of 1875 and deal with kindred subjects, and it is reasonable to presume that the revisers and legislators intended both to receive the same construction. It would seem strange to any common-sense observer that an entirely different meaning should be given to the same word in the two statutes, especially when in giving the narrower meaning to the word in the statute with regard to attorneys, we are compelled to give it a different meaning from that which the same word requires in the next line of the same statute.

We are not to forget that all statutes are to be construed, as far as possible, in favor of equality of rights. All restrictions upon human liberty, all claims for special privileges, are to be regarded as having the presumption of law against them, and as standing upon their defense, and can be sustained, if at all by valid legislation, only by the clear expression or clear implication of the law.

We have some noteworthy illustrations of the recognition of women as eligible or appointable to office under statutes of which the language is merely general. Thus, women are appointed in all parts of the country as postmasters. The act of Congress of 1825 was the first one conferring upon the postmaster-general the power of appointing postmasters, and it has remained essentially unchanged to the present time. The language of the act is, that "the postmaster-general shall establish post offices and appoint postmasters." Here women are not included except in the general term "postmasters," a term which seems to imply a male person; and no legislation from 1825 down to the present time authorizes the appointment of women, nor is there any reference in terms to women until the revision of 1874, which recognizes the fact that women had already been appointed, in providing that "the bond of any married woman who may be appointed postmaster shall be binding on her and her sureties." Some of the higher grades of postmasters are appointed by the president subject to con-

firmation by the senate, and such appointments and confir-
mations have repeatedly been made. The same may be
said of pension agents. The acts of Congress on the subject
have simply authorized "the president, by and with the
advice and consent of the senate, to appoint all pension
agents, who shall hold their offices for the term of four
years, and shall give bond," etc. At the last session of
Congress a married woman in Chicago was appointed for a
third term pension agent for the state of Illinois, and the
public papers stated that there was not a single vote against
her confirmation in the senate. Public opinion is every-
where approving of such appointments. They promote the
public interest, which is benefited by every legitimate use
of individual ability, while mere justice, which is of interest
to all, requires that all have the fullest opportunity for the
exercise of their abilities. These cases are the more note-
worthy as being cases of public offices to which the incum-
bent is appointed for a term of years, upon a compensation
provided by law, and in which he is required to give bond.
If an attorney is to be regarded as an officer, it is in a lower
sense.

We have had pressed upon us by the counsel opposed to
the applicant, the decisions of the courts of Massachusetts,
Wisconsin and Illinois, and of the United States Court of
Claims, adverse to such an application. While not prepared
to accede to all the general views expressed in those decis-
ions, we do not think it necessary to go into a discussion of
them, as we regard our statute, in view of all the considera-
tions affecting its construction, as too clear to admit of any
reasonable question as to the interpretation and effect which
we ought to give it.

In this opinion CARPENTER and LOOMIS, Js., concurred.

PARDEE, J., (dissenting.) In England women were not
admitted to the bar, and this rule of exclusion obtained
both in the colonial and our state judicial systems. I think
therefore that whenever the legislature has spoken of the

admission of "persons" to the bar it referred to persons not affected by this rule; and that it is the duty of the court to give effect to the meaning of the statute as thus ascertained; to follow rather than to precede the legislature in declaring that it has changed its mind.