## MARY P. WRIGHT v. JULIUS H. NOELL.

1. COUNTY SUPERINTENDENT OF PUBLIC INSTRUCTION; *Women are Eligible to Office.* In this state a woman is eligible to the office of county superintendent of public instruction. There is not only no express, constitutional disqualification of females, and no affirmative statement of qualifications which would exclude them, but there is nothing in the language of the section creating the office, nor in the duties imposed by law upon the officer, which would imply the necessary or intended exclusion of either sex.

2. ―――― As the people, with respect to certain offices, have seen fit by express constitutional provisions to restrict their freedom of choice, it is a fair inference that, where the constitution is silent, they intended no restriction.

3. ―――― The question, whether a woman can legally hold a public office, is not like the question whether an unnaturalized alien may vote or hold office. The inclinations, interests, and duties of aliens are presumptively with the nation of which they are citizens, and antagonistic everywhere else. But the men and women of our own nation are alike citizens. There is no antagonism. And whether females shall vote or hold office, is merely a question of internal public policy, and not a matter affecting the life and integrity of the nation.

*Error from Coffey · District Court.*

· AT the general election held in Coffey county on the 3d of November 1874, Miss *Mary P. Wright* received the highest

39—16 KAS.

number of legal votes cast for any person for the office of county superintendent of public instruction, and *Julius H. Noell* received the next highest number of legal votes cast for any person for the same office. The board of county canvassers declared Miss *Wright* elected to the said office, and granted her the certificate of election, whereupon she took the oath of office and filed her official bond. Afterward, *Noell* filed with the probate judge of the county, the statement contemplated by § 89 of ch. 36 of Gen. Stat. 1868, alleging that "Mary P. Wright, at the time of said election, was not eligible to the said office of county superintendent of public instruction for said county, being a woman"—and asking that her certificate of election be annulled, and that he be declared elected to the said office. The contest court was organized pursuant to the statute, and the case came on to be heard December 4th 1874. Miss *Wright*, the contestee, demurred to the statement of the contestor, upon the ground that said statement did not contain facts sufficient to constitute a cause of action. The contest court overruled the demurrer, and found that no person was elected to said office at the said election, and adjudged that the election as to said office be set aside, and that the contestee pay the costs. Miss *Wright* removed the case by petition in error to the district court, where a hearing was had at the December Term 1874, and the finding and judgment of the contest court were affirmed, and from such judgment of the district court Miss *Wright* now brings the case to this court by petition in error for review.

*Wm. B. Parsons*, for plaintiff in error.

*W. L. McConnell*, for defendant in error.

The opinion of the court was delivered by

BREWER, J.: Is a woman eligible to the office of county superintendent? In favor of it is the fact that the constitution contains no express disqualification of her, and no affirmative statement of the qualifications therefor, leaving, as is

claimed, the people free to choose whomsoever they will. Against it, is the fact that the right to vote is limited to males, implying, as is said, that *a fortiori* the right to hold office is likewise so restricted, and also the fact that at the time of the adoption of the constitution there was no serious thought of woman's holding the office, so that the framers thereof could not have intended by that instrument to authorize it. As between these two lines of argument, we yield our assent to the former. "All political power is inherent in the people," and all powers not delegated by the constitution remain with them. These truths, which lie at the foundation of all republican governments, are distinctly asserted in our own bill of rights, §§ 2 and 20. By the constitution the people have granted certain powers, and to that extent have restricted and limited their own action. But beyond those restrictions, and except as to matters guarded by absolute justice, and the inherent rights of the individual, the power of the people is unlimited. There is clearly no question of absolute justice, or individual rights, involved, so that we must look alone to the constitution to ascertain what restrictions the people have placed upon their power of choice of this officer. These restrictions may be as to the persons to make the choice, or as to the persons who may be chosen. Both of these restrictions were presented to the attention of the framers of the constitution in reference to the various offices created by that instrument, and both imposed as to some offices. Thus, generally, the power to choose officers was committed to the male adults—at first to the white male adults. And as to some officers, the power to choose was still further restricted. Thus, as to some, such as district judges, locality was an added restriction; (art. 3, § 5.) The reporter and clerk of this court, are chosen by the justices; (art. 3, § 4.) The state printer is chosen by the legislature; (art. 15, § 4, as amended in 1868.) And in all these cases, where the people have restricted their power by prescribing the qualifications of those to make the choice of officers, they cannot, except by an amendment of the same instrument, add to or take from

those restrictions. They have also prescribed certain qualifications for and imposed certain restrictions as to those who may be chosen. Thus, one who gives or accepts a challenge to fight a duel, or who knowingly carries a challenge, is ineligible to any office; (art. 5, § 5.) Any one who bribes an elector to procure his election, may not hold the office to which he was elected; (art. 5, § 6.) An essential to the holding of a judicial office is, residence in the county, township, or district for which the officer was elected; (art. 3, § 11.) To be a member of the legislature, one must be at the time of his election a qualified voter of and resident in the county or district for which he is chosen; (art. 2, § 4.) Hence, by this, only male adults can be elected to the legislature. None of these qualifications prescribed by the constitution may be disregarded. They are restrictions self-imposed by the people upon their otherwise unlimited freedom of choice. If they have as to certain offices seen fit to restrict their freedom of choice by express words, is it not a fair inference that, where the constitution is silent, they intended no restriction? In reference to county superintendent the constitution says this, and no more:

"A superintendent of public instruction shall be elected in each county, whose term of office shall be two years, and whose duty and compensation shall be prescribed by law." (Art. 6, § 1.)

There is here not only no express disqualification of females, and no affirmative statement of qualifications which would exclude them, but also nothing in the shape of pronoun, or in the terminology, or in the duties imposed, which would imply the necessary or intended exclusion of either sex. But it is said, that there is such a connection between voting and office-holding, that excluding females from the former, is by implication an exclusion of them from the latter; and that in the language of Ch. J. Dixon of Wisconsin, it is "an enormous absurdity that a person who by the organic law of the state has not one voice among thousands in designating by whom an office shall be filled, may himself be elected to such office, and enjoy its franchises and perform its duties."

In reference to the authority quoted, it may be remarked, that the case, that of *The State, ex rel., v. Smith,* 14 Wis. 497, presented the question of the right of an *alien* to hold an office to which he had been elected, there being no express statutory or constitutional disqualification therefor; and the argument from which an adverse conclusion was reached was not the mere relationship of voting to office-holding, but that, underlying statutes and constitution, and as the basis of all governmental organization, was the natural idea, or as the learned Justice expressed it, "As to all such governments (independent popular governments,) it is an acknowledged principle, which lies at the very foundation, and the enforcement of which needs neither the aid of statutory nor constitutional enactments or restrictions, that the government is instituted by the citizens for their liberty and protection, and that it is to be administered, and its powers and functions exercised, only by them, and through their agency." And he quotes approvingly from the reply of the Justices of the Supreme Court of Massachusetts to the question of the house of representatives, whether an alien could be a legal voter for senators and representatives—"Now we assume as an unquestionable principle of sound national policy in this state, that as the supreme power rests wholly in the citizens, so the exercise of it, or of any branch of it, ought not to be delegated by any but citizens, and only to citizens. It is therefore to be presumed, that the people in making the constitution intended that the supreme power of legislation should not be delegated but by citizens." But the cases and questions are not alike. It may well be, that the idea of an independent popular government implies that all its functions are to be exercised by citizens, and that it needs no express words to exclude aliens, because the inclinations, interests, and duties of the latter are presumptively with the nation of which they are citizens, and antagonistic everywhere else. But in the case at bar, the inclinations, interests, and duties of both the sexes are in the same direction. Both are alike citizens. There is no antagonism. Whether females

shall vote or hold office, is merely a question of internal public policy, and not a matter affecting the life and integrity of the nation, or its relations with other states.   It is a very common thing for offices 'to be filled outside of the electoral body, and in many cases it is imperatively so required by statute or custom.  Officers of a legislature are a ready illustration.  Our own constitution clearly recognizes the absence of any necessary connection between office-holding, and voting.  In § 2 of art. 5, as amended, it is provided that "No person under guardianship * * * shall be qualified to vote or hold office in this state."   If as is claimed, one of these is the larger, and includes or implies the other, a part of the section quoted is manifestly surplusage.

In reference to the argument that at the time of the adoption of the constitution there was no serious thought of woman's holding the office, and therefore that the framers thereof could not have intended by that instrument to authorize it, we cannot do better than to quote from the dissenting opinion of Justices Walton and Barrows of the supreme court of Maine, in reply to the question whether in that state a woman could under the constitution hold the office of justice of the peace:

"It may be true, that the framers of the constitution did not contemplate, did not affirmatively intend, that women should hold office.  But it by no means follows that they intended the contrary.  The truth probably is, that they had no intention one way or the other; that the matter was not even thought of.  And it will be noticed that the unconstitutionality of such a law is made to rest, not on any expressed intention of the framers of the constitution that women should not hold office, but upon a presumed absence of intention that they should.  This seems to us a dangerous doctrine.  It is nothing less than holding that the legislature cannot enact a law unless it appears affirmatively that the framers of the constitution intended that such a law should be enacted.  We cannot concur in such a doctrine.  It would put a stop to all progress.  We understand the correct rule to be the reverse of that, namely, that the legislature may enact any law that they may think proper, unless it appears affirmatively that the framers of the constitution intended that such a law should

not be passed. And the best and only safe rule for ascertaining the intention of the makers of any written law, is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing."

There is but little of authority to be cited upon this question. In the state of Maine five of the eight Justices were of the opinion that under the constitution a woman could not hold the office of justice of the peace, but could be authorized to administer oaths, take acknowledgment of deeds, and solemnize marriages. (Chicago Legal News, vol. 7, p. 10; 62 Maine, 596.) To a question of the legislature, whether under the constitution women could act as members of a school committee, the supreme court of Massachusetts replied as follows:

"The question is limited to the effect of the constitution upon the capacity of a woman to hold this office, and involves no interpretation of statutes. If the constitution prevents a woman from being a member of a school committee, it must be by force of some express provision thereof, or else by necessary implication, arising either from the nature of the office itself, or from the law of Massachusetts as existing when the constitution was adopted, and in the light of which it must be read. But the constitution contains nothing relating to school committees; the office is created and regulated by statute; and the constitution confers upon the general court full power and authority to name and settle annually, or provide by fixed laws for naming and settling all civil officers within the commonwealth, the election and qualification of whom are not in the constitution otherwise provided for. The common law of England, which was our law upon the subject, permitted a woman to fill any local office of an administrative character, the duties attached to which were such that a woman was competent to perform them. The duties of a school committee relate exclusively to the education of children and youth in the town or city for which it is elected. They consist of the general charge and superintendence of the schools, including the employment of teachers, the selection of school-books, the regulation of the attendance of scholars, and the preparation of school registers and returns; and they are in no respect of

such a nature that they cannot be well and efficiently performed by women. The necessary conclusion is, that there is nothing in the constitution of the commonwealth to prevent a woman from being a member of a school committee, and the proposed question must be respectfully answered in the affirmative." (115 Mass. 602.)

Without pursuing this matter further, our conclusion is, that women are in this state eligible to the office of county superintendent. The judgment therefore will be reversed, and the case remanded with instructions to proceed in accordance with the views herein expressed.

All the Justices concurring.