ATTORNEY GENERAL *v.* ABBOTT.

1. PUBLIC OFFICERS—PROSECUTING ATTORNEY — ELIGIBILITY OF WOMEN—COMMON LAW—CONSTITUTION.

At the common law, as it existed in this State at the time of the adoption of the Constitution, women had no general right to hold public office, and the Constitution, in providing by section 1 of the schedule that the common law, so far as it was not repugnant thereto, should remain in force, left women under such disability until such time as it might be removed by legislative action; and therefore, in the absence of enabling legislation, a woman chosen by the electors as prosecuting attorney is ineligible to hold the office.

2. SAME—QUALIFICATIONS—ELECTORS.

As a general rule, where the law is silent respecting qualifications to office, electors, and no others, are eligible.

MOORE, J., dissenting.

*Quo warranto* proceedings by Horace M. Oren, attorney general, to try the title of Merrie H. Abbott to the office of prosecuting attorney of Ogemaw county. Submitted June 22, 1899. Judgment of ouster October 17, 1899.

*Horace M. Oren, in pro. per.*

*Merrie H. Abbott (Allen B. Morse, Thomas A. E. Weadock,* and *John C. Weadock,* of counsel), *in pro. per.*

LONG, J. Merrie H. Abbott, the respondent, a woman of the age of 21 years and upwards, was elected to the office of prosecuting attorney of Ogemaw county at the general election held on the 8th day of November, 1898. She duly qualified, and is now in the discharge of the duties of that office. An information in the nature of a *quo warranto* is filed in this court by the attorney general, in which it is claimed that the respondent unlawfully holds

and exercises the duties of that office.   The only question raised is whether a woman is eligible under the Constitution and laws of this State to hold such office.

Section 3, art. 10, of the Constitution of this State, reads as follows:

"In each organized county there shall be a sheriff, a county clerk, a county treasurer, a register of deeds, and a prosecuting attorney chosen by the electors thereof once in two years, and as often as vacancies shall happen, whose duties and powers shall be prescribed by law."

It is the contention of the attorney general that the office of prosecuting attorney is a constitutional office, created by the Constitution of this State, which expressly provides that such official shall be chosen by the electors of the respective counties, and that such electors have no authority, under the Constitution and laws, to elect other than one of their own number to such office.   On the other hand, it is contended by the respondent that the Constitution and laws do not expressly require that the prosecuting attorney shall be an elector, while for some other offices named in the Constitution this qualification is distinctly required, and that this would indicate that, as to those offices in regard to which the instrument is silent, no such qualification is necessary; for, if the qualification of an elector is needed in order to hold the office of prosecuting attorney, then every other officer elected by the people and named in the Constitution must also be an elector.   It is also contended by the respondent that the common law of the State does not forbid a woman to hold the office of prosecuting attorney.

There being no express provision of the Constitution or the laws of the State conferring upon the respondent the right to hold this office, the question must be determined by the principles of the common law, and the manner in which those principles have been construed in this State for the past years.   It is conceded that the respondent is not an elector, and that she could not vote for a candidate for this office.   Section 1, art. 7, of the Constitution, pro-

vides who shall be electors. There can be no question of the common-law rule that a woman cannot hold a general public office, in the absence of express constitutional or statutory authority conferring upon her such right. If she is eligible to this office, then she is eligible to any constitutional office within the State. Judge Cooley, in his work on Principles of Constitutional Law (page 257), in discussing the question of eligibility to office, says, "When the law is silent respecting qualifications to office, it must be understood that electors are eligible, but no others." For more than 60 years this has been regarded as the settled law of this State. It commenced when this State was admitted into the Union, and, during all the time since, no one, to our knowledge, has ever insisted that women are eligible to those offices which must be filled by the votes of the qualified electors of the State or other municipalities.

In Cush. Law & Prac. Leg. Assem. § 57, it is said:

"It may also be laid down as a general principle founded in the nature of representative government, which supposes the electors, except in particular instances, to elect from among themselves, that no person can be elected to any office who is not himself possessed of the requisite qualifications for an elector. * * * Whatever other and different qualifications or disqualifications may be specified, every person who is voted for * * * must, at all events, possess the qualifications and be free from the disqualifications which attach to the character of an elector."

This language is quoted by Throop with approval in his work on Public Officers (section 72).

The supreme court of Wisconsin, in *State* v. *Smith*, 14 Wis. 497, and *State* v. *Murray*, 28 Wis. 96 (9 Am. Rep. 489), held that, in the absence of statutory authority, no one but a qualified elector could hold office. In the latter case it was said:

"We have already seen that the grounds upon which a person not an elector is excluded from holding public office is that the powers and franchises of a free and inde-

pendent government must be exercised by those by whom such government was instituted,— that is, by the electors thereof; so, if a person who is not an elector attempts to exercise the functions of a public office, the courts, upon proper proceedings being instituted for that purpose, will oust him."

In *Wilson* v. *Genesee Circuit Judge*, 87 Mich. 495 (24 Am. St. Rep. 173), the contention was whether a woman could hold the office of deputy county clerk.    Mr· Justice CHAMPLIN said:

"The relator contends that, under the provisions of the Constitution, none but an elector can be chosen to the office of county clerk.    In this I think he is correct, but its decision is not essential to the determination of the present case."

In *Robinson's Case*, 131 Mass. 376 (41 Am. Rep. 239), the right of a woman to vote or hold office was fully discussed, and the common-law rule, that in the absence of express authority a woman has no legal right to hold office, was fully sustained.

The case of *Atchison* v. *Lucas*, 83 Ky. 451, is quite in point with the present.    The constitution of that State confers the right to vote upon white male citizens of the proper age, etc., and bases the right to hold office upon citizenship.    It was said:

"The fourteenth amendment to the Constitution of the United States defines who are citizens, in the following language: 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside.' It is therefore not necessary to discuss the meaning of the word 'person' or the word 'citizen' as used in the State constitution, as both include women as well as men, in the most comprehensive sense.    But being a citizen does not necessarily entitle one to the right of suffrage, or the right to hold any constitutional office.    By the provisions of the constitution of this State adopted in the year 1792, and by a like provision of the constitution of 1799, as well as in the present constitution, women were excluded from the right of suffrage by conferring that right upon male citizens alone; and it would be a singular construction of

that provision in either constitution to determine that women should have no voice in the selection of those who are to fill the offices created by the constitution, and at the same time given the right to fill those offices if elected by the popular vote.   *   *   *   It necessarily follows, it seems to us, that when women are excluded from the right to vote when these officers are to be elected, they are also excluded from the right to hold the offices voted for."

Whatever may be said of some of the decisions of other States which counsel contend are at variance with the cases above cited and quoted from, it is difficult to get away from the proposition laid down by Judge Cooley, above quoted, that, "when the law is silent respecting qualifications to office, it must be understood that electors are eligible, but no others." Cooley, Const. Law, 257. Judge Cooley undoubtedly wrote that with the full understanding of its significance. He had in mind, without doubt, that that had been the uniform practice in this State for nearly 60 years at that time, and that such was the common law of the State.

It follows that a judgment of ouster must be entered.

GRANT, C. J., MONTGOMERY and HOOKER, JJ., concurred with LONG, J.

HOOKER, J. (*concurring*). The record in this case raises the question of the eligibility of a married woman to the office of prosecuting attorney. The respondent, having received a plurality of the votes cast for that office in her county at the election held in November, 1898, and entered upon the discharge of its duties, responds to a writ questioning her right thereto.

The Constitution does not state who shall be eligible to this office. Therefore it may reasonably be said that any person may hold it who was qualified under the laws as they existed when the Constitution was adopted, such laws being continued in force by Const. Sched. § 1:

"The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed by the legislature."

It would also seem that no one could hold office except those qualified under existing laws, for the Constitution, being silent, made no change.

At the common law, woman did not enjoy the legal right of participating in the government. The political privileges of voting and holding general public office were denied her. Some question is made over this, but we think it is an historical fact. The fullest discussion of the nature and extent of the right of a woman to hold office at common law, that we have ever seen, is in the opinion of Chief Justice Gray in *Robinson's Case*, 131 Mass. 376 (41 Am. Rep. 239), where the authorities are collected. The opinion of Mr. Justice Scholfield in *Schuchardt* v. *People*, 99 Ill. 504 (39 Am. Rep. 34), asserts the same doctrine, following *In re Bradwell*, 55 Ill. 535. In the former case it was held that the disability had been removed by statute, which the latter case had previously held that a constitution silent upon the subject was ineffective to do. In *Atchison* v. *Lucas*, 83 Ky. 465, it is declared that "at common law a woman could not hold any public office," and that, with three constitutions adopted for the State silent upon the subject, it could not be said that the right to hold office had been thereby conferred. Mechem, Pub. Off. § 73, says that by the law of England no woman under the degree of queen, married or unmarried, could take part in the government of the State; citing Bouv. Law Dict. tit. "Women," and other authorities. See, also, *Lockwood* v. *U. S.*, 9 Ct. Cl. 346; *In re Opinion of the Justices*, 107 Mass. 604, 115 Mass. 602; *Chorlton* v. *Lings*, L. R. 4 C. P. 374.

As has been foreshadowed, I am of the opinion that, if the common law in force in Michigan as it was in 1850 prohibited women from holding office, that prohibition was not removed by the adoption of a Constitution which contained no express or implied repeal of such prohibition, but, on the contrary, reaffirmed it by expressly providing that the law asserting such prohibition should continue in force. There is but one legitimate method of removing the disa-

121 MICH.—35.

bility, and that is legislative, not judicial. Some of the cases cited have intimated as much. That the legislature, and it only, has power to do this, is obvious. Certainly the courts are not authorized to do so, and a growing public sentiment favoring an enlargement of the rights of women should not have such effect. Laws are not repealed by a neglect to enforce them, and the legal *status* of woman rests on a more stable foundation than a varying or advancing public opinion of what that *status* should be.

It is argued that, inasmuch as the Constitution is silent upon the subject of the qualifications requisite to this office, we must recognize the right of any one to hold it. Aside from the fact that we find few authorities supporting this claim, we think that it is fallacious. The Constitution does not say that aliens may not hold many of the highest public offices. Neither does it say that infants may not, nor that persons *non compos mentis* may not. Nor does it say that a man shall be compelled to support his wife, nor that she may pledge his credit for necessaries, nor that she cannot make a valid contract, nor that the presumption of coercion by her husband shall not attach when she is charged with crime. Nor did the earlier Constitution declare that only attorneys-at-law could be prosecuting attorneys, yet the court so held in the case of *People* v. *May*, 3 Mich. 610; and all of the other legal principles mentioned were unchanged by the adoption of the Constitution. It must be evident that, when a new Constitution is adopted, the legislative blackboard is not washed clean. On the contrary, existing laws and rights under them remain, except as clearly inconsistent with the terms of the Constitution. There are many cases which hold that aliens are ineligible to public office. *State* v. *Smith*, 14 Wis. 497; *State* v. *Murray*, 28 Wis. 96 (9 Am. Rep. 489). Others hold that a minor is incapable of holding office. *Tyler* v. *Tyler*, 2 Root, 519; *Golding's Petition*, 57 N. H. 146 (24 Am. Rep. 66); *Barrett* v. *Seward*, 22 Vt. 176; *New Albany, etc., R. Co.* v. *Grooms*, 9 Ind. 243; *People* v. *Dean*, 3 Wend. 438.

We are confronted by the fact that women have held offices, and by cases which sustain some of their claims upon them.   Some of the cases cited hold that minors may be deputies under certain officers, and that they are capable of discharging ministerial duties, while they deny the right of holding public offices generally.   See *Jamesville, etc., R. Co.* v. *Fisher*, 13 L. R. A. 721 (109 N. C. 1), and note.   Authorities are not wanting in England that decide that women may hold offices which they inherit (but can get in no other way), and may perform the duties through deputies.   There are also instances where it has been held that they could hold local offices of little importance, where the duties were wholly ministerial.   But, while these cases support the claim that women might hold some offices, they reinforce the authorities which deny the general right contended for here.   It is undeniable that many women have held office under State and Federal governments, such as postmasters, pension agents, notaries public, deputy clerks, school officers, attorneys-at-law, etc. Many of them have held their offices only by sufferance, their right not having been questioned.   This proves nothing.   Others have held under statutes which the legislature had power to enact.   *Bloomer* v. *Todd*, 1 L. R. A. 113 (3 Wash. Terr. 599), note.   The case of *In re Hall*, 50 Conn. 131 (47 Am. Rep. 625), does no more than construe a very liberal statute, which provided that the court might admit as attorneys " such persons as are qualified therefor agreeably to the rules established " by the court. Such cases are not decisive of the question before us.   In other cases their right has depended upon the varying views of courts concerning the nature of the offices.   Some courts hold that the office of notary public is not within the right of a woman to hold.   See *Women as Notaries Public* (*Opinion of the Justices*), 150 Mass. 586 (6 L. R. A. 842); *State* v. *Davidson*, 92 Tenn. 531 (20 L. R. A. 311).   Others hold that it is.   *U. S.* v. *Bixby*, 10 Biss. 520. In this State the right is given by statute.   1 Comp. Laws 1897, § 2629; Act No. 117, Pub. Acts 1887.   A

number of cases hold that women may be deputy clerks, though not clerks. *Warwick* v. *State*, 25 Ohio St. 21; *Jeffries* v. *Harrington*, 11 Colo. 191; *Wilson* v. *Genesee Circuit Judge*, 87 Mich. 493 (24 Am. St. Rep. 173).

It is said that this case is concluded by the case last cited, and that the cases cited from Massachusetts and Illinois cannot apply, because they deny the right of women to hold the offices of notary public and attorney-at-law,—especially the latter, which we are said to have recognized their eligibility to. The recognition that has been accorded to women as attorneys is plainly authorized by statute. 1 Comp. Laws 1897, § 1121, provides that no one shall be excluded from that office on account of sex, while, under authorities relied upon in this case, there is room for the claim that they have been eligible under existing statutes since 1838, at least. As early as 1846 any citizen of this State was eligible (see Rev. Stat. 1846, chap. 95, § 27), while under Rev. Stat. 1838, part 3, tit. 1, chap. 6, § 13, any citizen of the United States might be licensed. In the Michigan case the learned writer of the opinion stated that a woman could not hold the office of clerk. What is the inference, if not that it was his opinion that she might perform the ministerial duties of a deputy, the office being one that permitted of a deputy? It does not follow that he would have held that she could succeed the clerk, under the statute, in case of his death. So in the Massachusetts cases we should not be asked to hold that the determination concerning the common law was any the less authoritative because we might disagree with the court as to the character of the office of attorney-at-law. Those cases exclude the offices of attorney-at-law and notary public from the list of ministerial offices that a woman may hold. Others do not. Thus, the case of *U. S.* v. *Bixby*, 10 Biss. 520, holds the office of notary purely ministerial. In short, all of these cases agree that a woman could not hold other than ministerial offices, but they differ as to what are the ministerial offices that she may hold.

I do not forget that there are other cases which are said to go the full length contended for in this case,—notably, the Kansas and Missouri cases cited. *State* v. *Hostetter*, 137 Mo. 636 (38 L. R. A. 208, 59 Am. St. Rep. 515); *Wright* v. *Noell*, 16 Kan. 601. The Missouri case is distinguishable from the case before us and the Kansas case. The constitution of Missouri was adopted in 1875. That instrument prescribed the qualifications of some officers; *e. g.*, the governor, lieutenant governor, secretary of state, auditor, treasurer, attorney general, and superintendent of schools, and members of the general assembly, were required to be male citizens. Circuit judges were required to be qualified voters, who *were* male citizens. It was further provided that "no person shall be elected or appointed to any office in this State, civil or military, who is not a citizen of the United States, and who shall not have resided in this State one year next preceding his election or appointment." Const. art. 8, § 12. According to this respondent's contention, this last provision, which was a new enactment in the organic law of Missouri, had the effect of removing the disability of women to such offices; but the Missouri court did not so hold. What it said was that "the constitution, we think, *remits to the legislature* the subject of proper qualifications to be possessed by the holders of such an office as is here in question." At the time this constitution was adopted, there was, and for many years had been, in force, a statute providing that "no person shall be appointed or elected clerk of any court, unless he be a *free white male* citizen of the United States, above the age of twenty-one years, and shall have resided within the State one whole year, and within the county for which he is elected three months, before the election; and every clerk shall, after his election, reside in the county for which he is clerk." 1 Rev. Stat. Mo. 1855, chap. 26, § 10. In 1879, four years after the adoption of the constitution, the legislature amended this law by dropping the words "*free white male.*" Commenting upon this, the court said:

"The dropping of the word 'male,' in describing the qualifications for such offices, has value as a guide to the legislative purpose in enacting the present law on this subject. Can there be any doubt as to the intended effect of such a change of the statute on the particular question before us? * * * The office of clerk of a court is a ministerial office. It admits of the use of a deputy, and its duties are certainly not of such a nature as to be incompatible of discharge by a woman. In view of the condition of the positive law of Missouri above described, we do not consider it necessary to enter into a discussion of the eligibility of women to office at the common law or in other States of the Union."

It is apparent, therefore, that this case, like the Connecticut case, goes no further than to construe a statute, and does not reach the question before us.

The principle of the Kansas case admits of no middle ground, and establishes woman's right to the highest executive and judicial offices, and to govern a State where she cannot vote. It seems on all fours with our own, and is entitled to great weight, from the eminence of the writer of the opinion. It appears to be based largely upon the proposition that, as the constitution required legislative officers to be electors, there was an implication, from the failure to prescribe the qualifications of other officers, that all persons were eligible. The court distinguished the case from that of an alien, from which we infer that it was of the opinion that an alien was ineligible. It did not indicate what it would say were the claimant an infant citizen. We can hardly suppose that it would hold an infant eligible to the higher executive and judicial offices, or that any other than a lawyer could hold the latter; yet the constitution has not precluded either, under the interpretation given. It may be said that a distinction might be made between the incapacity of minors, as was done in the case of aliens. No doubt there might be. As already said, a distinction was made as to aliens, and it may be said that the law looks upon a minor as mentally incompetent, as it does upon an idiot or lunatic, while this is not true of women. The incompetency in

each case is a legal and necessarily an arbitrary one. Adult aliens and women and many minors are mentally competent, yet this does not make them legally so. It is an arbitrary rule of law in each case which denies the privilege, and these rules of law all antedate and survive the adoption of the constitution. Their survival cannot be said to depend upon the character of the legal disability. The requirement that members of the legislature should be electors had the effect of preventing any legislative change of the law in that respect, and was a necessary provision to accomplish it. The absence of any provision in relation to other officers leaves the requisites within legislative control, and the omission was probably intended to have that effect. This sufficiently accounts for the omission, without concluding that it was designed to make every one eligible to all except the legislative offices, without legislative intervention.

Again, it may be said that the reason for the common-law rule no longer exists, and that the rule should fall with the reason for it; that Michigan, by legislation, has in recent years recognized the capacity of woman to do many things that she was not permitted to do at common law, one of which is to hold the position of attorney-at-law, and therefore there is no longer any reason for denying her eligibility to any office, and consequently there is no law prohibiting it. This, in short, amounts to saying that, when the legislature made a change in the *status* of woman by making her eligible to one office, it removed all of her political disabilities, except that relating to the ballot, which was beyond legislative power. If this is so, why did it not have the effect of removing all other disabilities? Why is she not now free to contract, and sign notes with others as surety? Why is she not drawn as juror and talesman in our courts of justice? It must be remembered that the proposition is not that the legislature might make all of these changes by proper enactment, which I do not question, but that, by the simple enactment that she may be permitted to practice law and to hold

school offices, all disabilities were at once removed. It is hardly supposable that the legislature so understood it, or that it was designed even to make her eligible to any offices except those mentioned. Had the title to the act been "to make woman eligible to the position of prosecuting attorney," it would hardly have supported a provision in the act itself making her eligible to the office of prosecuting attorney and all other offices, because the object of the act would not have been expressed in the title. Yet' exactly this, if not a great deal more, has been accomplished, if we are to hold that the reason of woman's disability has failed through the recognition of her ability to discharge the duties of one office, and that all of her disabilities have been removed with the reason. I do not mean to be understood as admitting that laws fall with the reason upon which they are based. It is sometimes said that "he who knoweth not the reason of the law knoweth not the law;" but it does not follow that courts may disregard a law when the reason for the rule is not apparent or is disapproved. It is the province of the legislature to apply the remedy in such cases.

Other States are mentioned where, under statutes or decisions, a somewhat different view from that entertained by me is taken, and it must be admitted that there is some conflict in the authorities; but I think the weight of authority, and the logic of the case, support me in the conclusion that the privilege of holding general public office has not been acquired by woman, and that only a constitutional provision or an act of the legislature can give it to her.

It remains to inquire whether the office of prosecuting attorney is such a ministerial office as to render a woman eligible. That, I think, is settled by one of our own decisions,— the case of *Engle* v. *Chipman*, 51 Mich. 524. It was there held that a prosecuting attorney could not delegate his powers; that he was vested with a personal discretion as a minister of justice. He might perhaps employ assistants when authorized by law, but could not

delegate his official discretion. It seems clear that this judicial discretion takes the office out of the class recognized by the common law, and the cases, both English and American, as within the right of woman to hold.

We have attempted to discuss this from a purely legal standpoint. An endeavor has been made to show that, in adhering to the doctrine here enunciated, "courts are not putting prohibitions into constitutions, upon some supposed understanding of the people at the time of their adoption." They are refusing to assert the implication of a repeal of laws which the Constitution expressly says shall continue in force. Taking that view of the question, we have no occasion to discuss the progress of the age, or the injustice of law to women. As we have said, the legislative branch of government is the proper one to consider the advisability of a change. I concur in the conclusion reached by Mr. Justice LONG.

GRANT, C. J., MONTGOMERY and LONG, JJ., concurred with HOOKER, J.

MOORE, J. (*dissenting*). I do not reach the same conclusion in this case as Mr. Justice LONG. It is doubtless true the authorities cited by him tend to sustain the conclusion reached by him; but a careful examination of them shows that the question involved here was not directly involved in the cases cited, while reason, as it seems to me, sustained by a very respectable weight of authority, reaches a conclusion more in keeping with the trend of modern thought. The citation made from Cushing is taken from a chapter headed "Legislative Assemblies," and the learned author is discussing only the question of who may be elected as members of legislative assemblies. As we shall see later, in this State that question is settled by a constitutional provision that the members of the legislature must be electors. Justice Cooley, in his Principles of Constitutional Law, uses the language cited. He does not discuss the question at all, but contents himself with citing the case of *State* v. *Smith*, 14 Wis. 497. A refer-

ence to the case cited shows that the only question was whether one who was an alien could be elected to the office of sheriff, and it was held that no one but a citizen could be elected to that office, and that the powers and functions of government could be exercised only through the agency of persons who were citizens of the government. The same question was involved in *State* v. *Murray*, 28 Wis. 96 (9 Am. Rep. 489); but in the latter case it was held that, though the person elected was an alien when the election was held, as he was naturalized before his term of office began, the election was not void, and he could hold the office. These cases should be regarded as authority only upon the question which is decided, especially in view of the fact that the same court held in *Re Goodell*, 39 Wis. 232 (20 Am. Rep. 42), that women could not be admitted to the bar of that court, while in the case of *In re Leach*, 134 Ind. 667 (21 L. R. A. 701), it is said:

"If the right [to be admitted to practice law] is not denied by the constitution and laws of the State, we should next inquire if it is denied by that part of the common law made by the constitution a part of the law of this State. We have searched in vain for any expression from the common law excluding women from the profession of the law."

We shall see later that the practice in this State has been in unison with the Indiana case.

In *Wilson* v. *Genesee Circuit Judge*, 87 Mich. 495 (24 Am. St. Rep. 173), the only question involved was whether a woman could be appointed deputy county clerk. It was not necessary to the decision of that question that the court should express its opinion of another question which was not before it, and that portion of the opinion may be regarded as *dictum*. The court unanimously held that women were not disqualified from holding the office of deputy county clerk. Inasmuch as the deputy county clerk, in the absence of the clerk, may act for and in his place, I do not think it can be assumed what the court would have decided if the other question had been

before it.   In *Robinson's Case*, 131 Mass. 376 (41 Am.
Rep. 239), the question was whether an unmarried woman
was entitled to be examined for admission as an attorney-
at-law, and the question was answered in the negative.
This court held later that a woman could not be appointed
to the office of notary public.   *Opinion of the Justices*,
150 Mass. 586 (6 L. R. A. 842).   Both of the Massa-
chusetts cases are contrary to the well-settled practice in
this State, as will appear later, as well as the holding in
many other States.

The disqualification imposed upon woman at the com-
mon law was incident to the prevailing order of society,
whose theory it was that the functions of womanhood
were limited to the domestic sphere, and that she could
have no legal existence apart from her husband.   She
could not engage in business on her own account, nor
make a binding contract without his consent.   Her time
and her earnings belonged to him, and it was said, because
of the delicacy of her nature, she was unfitted for the
activities pursued by men.   Under the common law an
unmarried woman had no redress for wrongs against her
purity.   She could be slandered without a right to bring
an action for slander.   Upon marriage her person as well
as her property was given over to her husband.   He
might beat her, and she could not complain.   She was
the victim of his will, and had such rights only as he
chose to give her.

Under the chapter headed "Legislative Assemblies,"
Cush. Law & Prac. Leg. Assem. § 56, it is said:

"The same descriptions of persons, namely, minors,
idiots and lunatics, women, and aliens, who have already
been mentioned as excluded from the right of suffrage by
the common political law, are also prohibited, and for the
same reasons, from being elected to any political office
whatever.   Such persons consequently cannot be mem-
bers of a legislative assembly."

The reasons assigned for these disqualifications are, in
the case of infants, the same general ground on which

they are prohibited from doing any other legal act, namely, their presumed want of capacity. When they attain their majority, the incapacity ceases and the disqualification ends. Idiots and lunatics are also excluded for the same reason,—want of capacity. As to the former, the disability is perpetual, because the want of capacity is perpetual. As to lunatics, the disqualification ceases during lucid intervals. Aliens are disqualified because they are not supposed to have knowledge of our institutions. But when they become naturalized, the disqualification ends. But it is now said that though woman is no longer disqualified, for want of intelligence or ability, to make contracts or to intelligently perform all the duties of citizenship, ''she, being destined by the law of her sex for a state of existence purely domestic, is therefore incapable of deciding upon those interests which are involved in questions of political suffrage '' (Cush. Law & Prac. Leg. Assem. § 30); and so she is to continue to be classed with children, idiots, lunatics, and aliens. As the reason stated is so contrary to what we see daily in our contact with pure, refined, intelligent, and capable womanhood, the rule of the disqualification ought to pass with the reason of the rule, unless the law is so firmly established that it remains for the people to act by an expression of their will in the written organic law. As we shall see later, they have so expressed themselves upon the question of suffrage, but, as I shall endeavor to show, they have not precluded woman from holding certain of the offices at their bestowal.

In writing of the common law, Justice Cooley, in his Constitutional Limitations (page 33, 6th Ed.), says:

''Many of its features were exceedingly harsh and repulsive, and gave unmistakable proofs that they had their origin in times of profound ignorance, superstition, and barbarism. The feudal system, which was essentially a system of violence, disorder, and rapine, gave birth to many of the maxims of the common law; and some of these, long after that system has passed away, may still be traced in our law, especially in the rules which govern the acquisition, control, and enjoyment of real estate. The

criminal code was also marked by cruel and absurd features, some of which have clung to it with wonderful tenacity, even after the most stupid could perceive their inconsistency with justice and civilization."

With all its harshness towards woman, it is doubtful if the common law ever went to the extent of saying that when an office, the duties of which she was fitted to perform, was offered to a woman, she could not hold it, simply because she was a woman. England has had many rulers who were women. All history does not record a more brilliant reign of any sovereign than that of the intelligent and capable Queen Victoria. Women have held almost all the offices of the kingdom. 3 Camp. Lives Ch. Just. 108. Ann, countess of Pembroke, held the office of sheriff of Westmoreland, and exercised the duties thereof in person, at a time when the sheriffs held court and exercised judicial power. 2 Co. Litt. 326; 8 Bac. Abr. 661; 41 Alb. Law J. 244. Eleanor was appointed lord keeper of England, and performed the duties of lord chancellor in person. She sat as judge, performing the duties of lord chancellor, judicial as well as ministerial, for nearly a year. 1 Camp. Lives Ld. Ch. 28; 41 Alb. Law J. 244; *Schuchardt* v. *People*, 39 Am. Rep. 36 ( 99 Ill. 501 ), note. Woman was allowed to be the keeper of a castle. *Lady Russell's Case*, Cro. Jac. 17. So, an overseer of the poor (*Rex* v. *Stubbs*, 2 Term R. 395); governor of a workhouse (2 Ld. Raym. 1014); keeper of a prison (*Lady Braughton's Case*, 3 Keb. 32, 151); commissioner of sewers (*Countess of Warwick's Case*, Callis, Sew. [4th Ed.] marg. p. 250); and marshal of a court (41 Alb. Law J. 245).

Women have been appointed to, and successfully filled, the positions of postmasters, pension agents, and other positions under the Federal government, though the Constitution and statutes did not in express terms authorize their appointment to any of these positions. No one has suggested that, because of the common law, she was disqualified. The validity of these appointments, so far as

we know, has never been questioned.    In some of the
States it is held that a woman cannot, because of the com-
mon-law disability, hold any office,—not even the office of
notary public,—unless the right to do so is expressly con-
ferred upon her.    *State* v. *Davidson*, 92 Tenn. 531 (20 L.
R. A. 311); *Opinion of the Justices*, 150 Mass. 586 (6
L. R. A. 842).    In this State the governor is not author-
ized in express terms to appoint women to the office of
notary public, though the right to do so was given by im-
plication in 1887; and yet it is a matter of common knowl-
edge that for years prior to 1887 many of them were
appointed notaries public, and discharged the duties of
that office, without their right to do so having been ques-
tioned.    See *U. S.* v. *Bixby*, 10 Biss. 520.    The office
of school inspector is named in the Constitution, and
though for that reason, as she is not an elector, it has been
held that in townships women cannot vote for a candi-
date for that office (*Belles* v. *Burr*, 76 Mich. 1), the office
itself has been held by women without question for years.
She has also held the office of school examiner and school
commissioner, while in many counties of the State there
are women deputy county clerks and deputy registers of
deeds.    Prior to 1895, in this State the sex of the persons
who might be admitted to practice law was not referred to
in the statute which provided for the admission of persons
to practice law, but long prior to that time women were
admitted to the practice of the law, through having ob-
tained the requisite degree from the Michigan University,
and also upon examination in open court.

Up to this point the discussion does not directly deter-
mine the question involved in this case, to wit, may the
people elect to a constitutional office one who possesses all
the requisite qualifications (when no qualifications for the
office named are mentioned either in the Constitution or
the statutes), except that she is a woman?    To dispose of
this question, it becomes necessary to inquire what limita-
tions the people have imposed upon themselves by the
adoption of a written constitution.    In discussing the

formation and amendment of state constitutions, Justice Cooley makes use of this language (Cooley, Const. Lim. 6th Ed., p. 48):

"Many other things are commonly found in these charters of government; but since, while they continue in force, they are to remain absolute and unchangeable rules of action and decision, it is obvious that they should not be made to embrace within their iron grasp those subjects in regard to which the policy or interest of the State or of its people may vary from time to time, and which are therefore more properly left to the control of the legislature, which can more easily and speedily make the required changes.    In considering state constitutions, we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them.    These instruments measure the powers of the rulers, but they do not measure the rights of the governed.    'What is a constitution, and what are its objects? It is easier to tell what it is not than what it is.    It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants [no rights to the people, but is the creature of their power, the instrument of their convenience.    Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought.    There is nothing primitive in it; it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, a love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny.    A written constitution is in every instance a limitation upon the powers of government in the hands of agents; for there never was a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition.'"

Another very able writer says:

"This, then, is the office of a written constitution:

To delegate to various public functionaries such of the powers of government as the people do not intend to exercise for themselves; to classify these powers according to their nature, and to commit them to separate agents; to provide for the choice of these agents by the people; to ascertain, limit, and define the extent of the authority thus delegated; and to reserve to the people their sovereignty over all things not expressly committed to their representatives." Hurlbut, Human Rights; Cooley, Const. Lim. (6th Ed.) 48, note.

The people of this Commonwealth, in framing and adopting their Constitution (article 7, § 1 ), provided that male persons over the age of 21 years, possessing the other qualifications mentioned, should be electors; thereby establishing what the qualifications of an elector should be. The Constitution is silent as to what the qualifications shall be of some of the officers provision for whose election is made in the Constitution, while it provides what the qualifications of certain other officers shall be. Applying the reasonable rule of construction to this situation, does it not clearly appear that, where the people have not put into the Constitution the qualifications required to make one eligible to a given office, they have reserved the right to the people, speaking through those whom they have designated as electors, to elect those persons whom they will, subject only to the rule that the person so elected shall be competent to discharge the duties of the office ? The Constitution provides that senators and representatives in the state legislature must be electors (article 4, § 5), and that the governor and lieutenant governor must be citizens (article 5, § 2). Township officers, including school inspectors, are named in the Constitution (article 11, § 1). Prior to 1879, the statute provided, in relation to township officers, that "no person except an elector as aforesaid shall be eligible to any elective office contemplated in this chapter." Rev. Stat. 1846, chap. 16, § 103. Neither the Constitution nor the statute requires that the person elected prosecuting attorney shall be an elector.

Daniel Goodwin was elected judge of a circuit in which

he did not reside.   It was claimed that, because of his non-residence in the circuit, he was disqualified from holding the office, and an action was brought to determine his right to exercise the functions of circuit judge.   In decid-ing the case, Justice CAMPBELL, among other things, said:

"The words of the Constitution not expressly requiring residence, it becomes necessary to determine whether such a requirement is to be drawn from the context, or from any recognized principles of law or usage.   *   *   * Senators and representatives are required to be qualified electors in the respective counties and districts which they represent.   *   *   *   We have here, then, proof that, in such cases as were doubtful, it was deemed necessary to declare distinctly that incumbents should be residents.   There being no such declaration in regard to circuit judges, we must find the restriction, if it exists, in the necessary incidents of the office, or in some binding usage."

It was held that Judge Goodwin was not disqualified. *People* v. *Goodwin*, 22 Mich. 496.

In *Barker* v. *People*, 3 Cow. 703 (15 Am. Dec. 322), the following language is used:

"Eligibility to public trusts is claimed as a constitutional right which cannot be abridged or impaired.   The consti-tution establishes and defines the right of suffrage, and gives to the electors and to various authorities the power to confer public trusts.   It declares that ministers of re-ligion shall be ineligible to any office; it prescribes, in respect to certain offices, particular circumstances, without which a person is not eligible to those stations; and it pro-vides that persons holding certain offices shall hold no other public trust.   Excepting particular exclusions thus established, the electors and the appointing authorities are, by the constitution, wholly free to confer public stations upon any person, according to their pleasure.   The consti-tution giving the right of election and the right of ap-pointment, these rights consisting essentially in the free-dom of choice, and the constitution also declaring that certain persons are not eligible to office, it follows from these powers and provisions that all other persons are eligible.   Eligibility to office is not declared as a right or principle by any express terms of the constitution, but it

121 MICH.—36.

results as a just deduction from the express powers and provisions of the system. The basis of the principle is the absolute liberty of the electors and the appointing authorities to choose and to appoint any person who is not made ineligible by the constitution. Eligibility to office, therefore, belongs not exclusively or especially to electors enjoying the right of suffrage. It belongs equally to all persons whomsoever, not excluded by the constitution."

In *Cummings* v. *Missouri*, 4 Wall. 277, it is said:

"The theory upon which our political institutions rest is that all men have certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one; and that in the protection of these rights all are equal before the law."

It is urged that, at the time the Constitution of the State was adopted, no one supposed woman would want to hold an office, and the constitutional provision must be construed in the light of that supposition. A like proposition in relation to the construction to be given to a statute is discussed in *Re Hall*, 50 Conn. 131 (47 Am. Rep. 625). This was an application by a woman to be admitted to practice law. The language used by the court is also pertinent to other propositions involved in this case. It is as follows:

"It is not contended, in opposition to the application, that the language of this statute is not comprehensive enough to include women, but the claim is that, at the time it was passed, its application to women was not thought of, while the fact that women have never been admitted as attorneys, either by the English courts or by any of the courts of this country, had established a common-law disability, which could be removed only by a statute intended to have that effect. It is hardly necessary to consider how far the fact that women have never pursued a particular profession or occupied a particular official position, to the pursuit or occupancy of which some governmental license or authority was necessary, constitutes a common-law disability for receiving such license or authority, because here the statute is ample for removing that disability, if we can construe it as applying to women; so that we come back to the question whether we are by

construction to limit the application of the statute to men alone, by reason of the fact that in its original enactment its application to women was not intended by the legislators that enacted it.  And upon this point we remark, in the first place, that an inquiry of this sort involves very serious difficulties.  No one would doubt that a statute passed at this time in the same words would be sufficient to authorize the admission of women to the bar, because it is now a common fact, and presumably in the minds of legislators, that women in different parts of the country are, and for some time have been, following the profession of law.  But, if we hold that the construction of the statute is to be determined by the admitted fact that its application to women was not in the minds of the legislators when it was passed, where shall we draw the line ? All progress in social matters is gradual.  We pass almost imperceptibly from a state of public opinion that utterly condemns some course of action to one that strongly approves it.  At what point in the history of this change shall we regard a statute, the construction of which is to be affected by it, as passed in contemplation of it ?  When the statute we are now considering was passed, it probably never entered the mind of a single member of the legislature that black men would ever be seeking for admission under it.  Shall we now hold that it cannot apply to black men ?  We know of no distinction in respect to this rule between the case of a statute and that of a constitutional provision.  When our State constitution was adopted (1818), it was provided in it that every elector should be eligible to any office in the State, except where otherwise provided in the constitution.  It is clear that the convention that framed, and probably all the people who voted to adopt, the constitution, had no idea that black men would ever be electors, and contemplated only white men as within any possible application of the provision, for the same constitution provided that only white men should be electors.  But, now that black men are made electors, will it do to say that they are not entitled to the full rights of electors in respect to holding office because an application of the provision to them was never thought of when it was adopted ? Events that gave rise to enactments may always be considered in construing them.  This is little more than the familiar rule that in construing a statute we always inquire what particular mischief it was designed to remedy.

Thus, the Supreme Court of the United States has held that in construing the recent amendments of the Federal Constitution, although they are general in their terms, it is to be considered that they were passed with reference to the exigencies growing out of the emancipation of the slaves, and for the purpose of benefiting the blacks. *Slaughter-House Cases,* 16 Wall. 67; *Strauder* v. *West Virginia,* 100 U. S. 306. But this statute was not passed for the purpose of benefiting men, as distinguished from women. It grew out of no exigency caused by the relations of the sexes. Its object was wholly to secure the orderly trial of causes and the better administration of justice. Indeed, the preamble to the first statute providing for the admission of attorneys states its object to be for the well ordering of proceedings and pleas at the bar. * * *

"We are not to forget that all statutes are to be construed, as far as possible, in favor of equality of rights. All restrictions upon human liberty, all claims for special privileges, are to be regarded as having the presumption of law against them, and as standing upon their defense, and can be sustained, if at all by valid legislation, only by the clear expression or clear implication of the law. We have some noteworthy illustrations of the recognition of women as eligible or appointable to office under statutes of which the language is merely general. Thus, women are appointed in all parts of the country as postmasters. The act of Congress of 1825 was the first one conferring upon the postmaster general the power of appointing postmasters, and it has remained essentially unchanged to the present time. The language of the act is that 'the postmaster general shall establish postoffices and appoint postmasters.' Here women are not included, except in the general term 'postmasters,' a term which seems to imply a male person; and no legislation from 1825 down to the present time authorizes the appointment of women, nor is there any reference in terms to women until the revision of 1874, which recognizes the fact that women had already been appointed, in providing that 'the bond of any married woman who may be appointed postmaster shall be binding on her and her sureties.' Some of the higher grades of postmasters are appointed by the president, subject to confirmation by the senate, and such appointments and confirmations have repeatedly been made. The same may be said of pension agents. The acts of Congress on

the subject have simply authorized the president, by and with the advice and consent of the senate, to appoint all pension agents, who shall hold their offices for the term of four years, and shall give bond, etc.   At the last session of Congress a married woman in Chicago was appointed, for a third term, pension agent for the State of Illinois, and the public papers stated that there was not a single vote against her confirmation in the senate.   Public opinion is everywhere approving of such appointments.   They promote the public interest, which is benefited by every legitimate use of individual ability, while mere justice, which is of interest to all, requires that all have the fullest opportunity for the exercise of their abilities.   These cases are the more noteworthy as being cases of public offices to which the incumbent is appointed for a term of years upon a compensation provided by law, and in which he is required to give bond."

See, also, *In re Leach*, 134 Ind. 670 (21 L. R. A. 705), which quotes with approval from the above case.

A case which is in point is that of *State* v. *Hostetter*, 137 Mo. 636. (38 L. R. A. 208, 59 Am. St. Rep. 515). The office of county clerk is named in the constitution of that State.   The constitution limits the right to vote to males.   It also provides that certain officers must be male citizens, and others electors.   The constitution is silent as to the qualifications for the office of county clerk.   At a general election held in 1896, Mrs. Wheeler was elected to the office of county clerk.   It was claimed there, as here, "that, in the absence of some constitutional or statutory provisions upon the subject, a woman is ineligible to hold a public office."   Many of the authorities cited in this case were cited in that case.   The court held that Mrs. Wheeler was not disqualified, and that her election was valid.

In *Wright* v. *Noell*, 16 Kan. 601, the question involved was whether a woman was eligible to the office of county superintendent of public instruction.   In a very able opinion by Justice Brewer, it is said:

"Is a woman eligible to the office of county superintendent?   In favor of it is the fact that the constitution

contains no express disqualification of her, and no affirmative statement of the qualifications therefor; leaving, as is claimed, the people free to choose whomsoever they will. Against it is the fact that the right to vote is limited to males, implying, as is said, that *a fortiori* the right to hold office is likewise so restricted, and also the fact that at the time of the adoption of the constitution there was no serious thought of woman's holding the office, so that the framers thereof could not have intended by that instrument to authorize it. As between these two lines of argument, we yield our assent to the former. All political power is inherent in the people, and all powers not delegated by the constitution remain with them. These truths, which lie at the foundation of all republican governments, are distinctly asserted in our own bill of rights (sections 2, 20). By the constitution the people have granted certain powers, and to that extent have restricted and limited their own action. But beyond those restrictions, and except as to matters guarded by absolute justice and the inherent rights of the individual, the power of the people is unlimited. There is clearly no question of absolute justice or individual rights involved, so that we must look alone to the constitution to ascertain what restrictions the people have placed upon their power of choice of this officer. These restrictions may be as to the persons to make the choice, or as to the persons who may be chosen. Both of these restrictions were presented to the attention of the framers of the constitution in reference to the various offices created by that instrument, and both imposed as to some offices. Thus, generally, the power to choose officers was committed to the male adults,—at first to the white male adults. And as to some officers the power to choose was still further restricted. Thus, as to some, such as district judges, locality was an added restriction. (Article 3, § 5.) The reporter and clerk of this court are chosen by the justices. (Article 3, § 4.) The state printer is chosen by the legislature. (Article 15, § 4, as amended in 1868.) And in all these cases, where the people have restricted their power by prescribing the qualifications of those to make the choice of officers, they cannot, except by an amendment of the same instrument, add to or take from those restrictions. They have also prescribed certain qualifications for, and imposed certain restrictions as to, those who may be chosen. Thus, one who gives or accepts a challenge to fight a duel, or who knowingly carries

a challenge, is ineligible to any office. (Article 5, § 5.) Any one who bribes an elector to procure his election may not hold the office, to which he was elected. (Article 5, § 6.) An essential to the holding of a judicial office is residence in the county, township, or district for which the officer was elected. (Article 3, § 11.) To be a member of the legislature, one must be at the time of his election a qualified voter of, and resident in, the county or district for which he is chosen. (Article 2, § 4.) Hence, by this, only male adults can be elected to the legislature. None of these qualifications prescribed by the constitution may be disregarded. They are restrictions self-imposed by the people upon their otherwise unlimited freedom of choice. If they have, as to certain offices, seen fit to restrict their freedom of choice by express words, is it not a fair inference that where the constitution is silent they intended no restriction?"

In the discussion, the learned justice refers to the Wisconsin cases referred to in the opinion of Justice LONG, which quote approvingly from the Massachusetts court, and says, as I have before attempted to show:

"The cases and questions are not alike. It may well be that the idea of an independent popular government implies that all its functions are to be exercised by citizens, and that it needs no express words to exclude aliens, because the inclinations, interests, and duties of the latter are presumptively with the nation of which they are citizens, and antagonistic anywhere else. But in the case at bar the inclinations, interests, and duties of both the sexes are in the same direction. Both are alike citizens. There is no antagonism. Whether females shall vote or hold office is merely a question of internal public policy, and not a matter affecting the life and integrity of the nation or its relations with other states. It is a very common thing for offices to be filled outside of the electoral body."

The justice then refers to the argument that at the time of the adoption of the constitution there was no serious thought of women holding the office, and therefore the framers of the constitution could not have intended they should, and concludes that such a doctrine is dangerous; quoting with approval the following language from *Opinion of the Justices*, 62 Me. 600:

" The best and only safe rule for ascertaining the intention of the makers of any written law is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted and none omitted without a design for so doing."

It was held that women were eligible to the office.

In *Von Dorn* v. *Mengedoht*, 41 Neb. 535, it was held that a woman might hold the office of notary public; the holding being contrary to that of the Massachusetts court. In *State* v. *Gorton*, 33 Minn. 345, it was held that a woman might be elected to the office of county superintendent of schools, though she could not vote for a candidate for that office.   In *Re Thomas*, 16 Colo. 441 (13 L. R. A. 538), on the application of a woman to be admitted to practice law, the court cites the cases from Wisconsin and Massachusetts, and declines to follow them.

The statutes of this State confer upon woman the right to practice law.  She may represent her client in the most important litigation in all the courts of the State, and no one can dispute her right.  She may defend a person charged with murder.  Can she not prosecute one charged with the larceny of a whip?  To say she cannot seems illogical.  The State, by granting her a certificate to practice law, has held her out to all individuals as a person competent to do so.  Individuals may employ her, and the courts must recognize her employment.  If the people see fit, by electing her to an office the duties of which almost wholly pertain to the practice of the law, to employ her to represent them in their litigation, why should not the courts recognize the employment?  I confess I can see no reason why they should not.  It is conceded that, as there is no constitutional inhibition which would bar a woman from holding the office, the legislature could authorize her to do so.  If this is so, has not the legislature, by a fair implication, authorized women to fill the office of prosecuting attorney?  We have already seen the statutes of the State allow women to be admitted to prac-

tice law.  1 Comp. Laws 1897, § 1121.  When a person is admitted to practice, that person is "authorized to practice in every court of law in this State." Id. § 1127. Does this statute put any limitation upon the kind of cases the person so admitted may try, based upon a question of sex?  Does it say the lawyer may represent individuals, but cannot represent municipalities, and must not represent the people of the State ?   I think these questions must be answered in the negative.   The legislature has provided that woman may practice law, and avail herself of the honor and profit of accepting all legitimate legal business which is offered her, criminal as well as civil.   By so doing has not the legislature said she may have the people of the State as her client, if they see fit to employ her?   It is not necessary, however, to decide the case by an affirmative answer to this question.   I think I have shown by the great weight of authority that, where the Constitution and the statutes are silent as to the qualifications for a given office, the people may elect whom they will, if the person so elected is competent to discharge the duties of the office.   The duties of the office of prosecuting attorney are prescribed by statute.   Those duties are such as can, in the main, be performed only by a person learned in the law.   None of them are of such a character as to preclude one from their performance simply because of sex.   Mrs. Abbott is a citizen of the State, upwards of 21 years of age.   She is a graduate of the law department of the University of Michigan.   She is duly authorized to practice law in all the courts of this State. There can be no question in the mind of any one who heard the very able oral argument made by her in this case about the entire competency of Mrs. Abbott to discharge the duties of this office.

I think the respondent is eligible to hold the office, and that the information in the nature of a *quo warranto* of the attorney general should be dismissed.