]No. 1519, April 20, 1914.[

STATE OF NEW MEXICO, Appellant, v. LOLA CHAVES de ARMIJO, Appellee.

SYLLABUS (BY THE COURT)

1. The right to hold a public office is not a natural right. It exists, where it exists at all, only because and by virtue of some law expressly or impliedly conferring it.

P. 650

2. The right may be conferred by act of the legislature, or exist by virtue of the common law, in those jurisdictions

where the common law is in force, and no statute expressly
or impliedly denies the right.

P. 650

3. Section 1 of chapter 134, S. L. 1909, which provides that
"No person prevented by the Organic Act of the Territory of
New Mexico * * * * shall be entitled to vote or hold public
office in this Territory," refers to the original act of Congress
creating the Territory of New Mexico, and the only limita-
tions thereby imposed upon the right to vote or hold public
office are that such rights shall be exercised only by citizens
of the United States, including those recognized as citizens
by the treaty with the Republic of Mexico, etc.

P. 652

4. The statutory law of the Territory of New Mexico
neither expressly conferred or denied the right of women to
vote or hold public office, hence we must look to the common
law, if it was in force in the Territory, to ascertain and
determine the right of women to vote and hold public office.

P. 653

5. The common law is the rule of practice and decision in
New Mexico, by virtue of section 2871, R. S. 1897, except
where modified by statute.

P. 654

6. The office of State Librarian is in ministerial office.

P. 656

7. Under the common law, a woman was eligible to hold
a purely ministerial office, whatever might be the nature of
the office, if she was capable of performing the duties there-
of, and there was no incompatibility between the nature and
character of the duties of the office and their due perform-
ance by a woman, where, in so doing, she was not called
upon to exercise judgment and discretion.

P. 656

8. Such political rights as were recognized by the com-

mon law, and not in conflict with our established laws, institutions and customs, and suitable to our conditions was carried into the body of our law.

P. 659

9. The appellee, being rightfully in office at the time of the adoption of the Constitution, she was continued in office by virtue of section 9, article XXII of the Constitution.

P. 666

Appeal from the District Court of Santa Fe County; Edmund C. Abbott, District Judge; affirmed.

RENEHAN & WRIGHT, Santa Fe, N. M., for appellee.

Laws of Territory, not inconsistent with the Constitution, shall remain in force. Const. N. M., art. XXII, sec. 4; Id., sec. 9.

Women may hold the office of notary public and such other appointive offices as may be provided by law. Const. (N. M.), art. XX, sec. 77.

In all the courts of this Territory, the common law as recognized in the United States of America, shall be the rule of practice and decision. C. L. 1897, sec. 2871; Browning v. Browning, 3 N. M. 671; sec. 1823, C. L. 1884.

Right of women to hold office. Robinson's Case, 131 Mass. 376; Bradwell's Case, 55 Ill. 535; 62 Me. 597; Mechem on Public Officers, sec. 73; 66 N. H. 207; 73 N. H. 621; Opinion of the Justice, 115 Mass. 602; Wright v. Noll, 16 Kans. 602; Huff v. Cook, 44 Ia. 639; State, ex rel., v. Hoffstetter, 137 Mo. 636, 38 L. R. A. 208; Id., note.

Office of State Librarian is a ministerial office. C. L. 1897, Tit., 23.

"As may be provided by law" is equivalent to the expression "as may have been provided by law." Vol. 5, Words & Phrases, p. 4449; Griggs v. City of St. Paul, 56 Minn. 150, 57 N. W. 461.

The office is appointive and not elective. Const. (N. M.) art. VII, secs. 1 and 2; Territory v. Maxwell, 2 N.

M. 268-9; Browning v. Browning, 3 N. M. 674; Kirchner
v. Laughlin, 4 N. M. 394; Childers v. Talbott, 4 N. M.
336; Territory v. Ashenfelter, 4 N. M. 109; Eberle v. Car-
michael, 8 N. M. 698; Byerts v. Robinson, 9 N. M. 431;
Albright v. Territory, 13 N. M. 133; Ry. Co. v. Cazier,
13 N. M. 133; Sandoval v. Albright, 14 N. M. 349; Rad-
cliff v. Chavez, 15 N. M. 264.

FRANK W. CLANCY, Santa Fe, Attorney General; FELIX
LESTER and SUMMERS BURKHART, Albuquerque, N. M.,
for appellant.

RENEHAN & WRIGHT, for appellee; supplemental brief
on re-argument.

Revised Statutes of U. S., secs. 1859-60.

Can a State office be a local office? Vol. 7, Words &
Phrases, title "State Officers;" People v. Nixon, 158 N. Y.
221; State v. Dillon, 90 Mo. 229; State v. Burns, 38 Fla.
367; In re Board of Health, 60 N. Y. Supp. 27.

Effect of sections 1859 and 1860 of the Revised Statutes
of the United States; and the effect of sec. 2871, C. L.
1897, upon the provisions of sections 1859 and 1860 of the
Rev. Stat. of U. S.; Ex Parte DeVore, 18 N. M. 246.

Distinction between Civil and Political Rights. Fletcher
v. Tuttle, 151 Ill. 41, 42 Am. St. Rep. 220; State, ex rel.
v. Quible, 125 N. W. 619; State v. Cones, 15 Neb. 444,
19 N. W. 682.

Right of a woman to hold office at Common Law. State,
ex rel. Hostetter, 137 Mo. 636, 38 L. R. A. 208, and note;
State ex rel. v. Quible, 125 N. W. 619.

Specific statute making women eligible to appoinive of-
fices. Laws 1913, ch. 60; Constitution of N. M., art.
XXII, sec. 9.

## OPINION OF THE COURT.

ROBERTS, C. J.—This is a quo warranto proceeding
to oust the respondent from the office of State Librarian.
The sole basis for the proceeding is the fact of the alleged
ineligibility of the respondent to hold the office on account

of sex, she being a woman. The District Court held that the respondent was eligible and dismissed the petition, and the State appealed.

A discussion of the matter involved would seem naturally to present the following inquiries, viz:—

1. What is the nature of the right to hold public office, and what is the source of that right?

2. What provision, either statutory or common law, or both, had been made in this jurisdiction in that regard prior to the adoption of the State Constitution?

3. What effect, if any, did the Constitution have upon the right?

It may be stated that the right to hold a public office is not a natural right. It exists, where it exists at all, only because and by virtue of some law expressly or impliedly conferring it. Mechem on Public Officers, sec. 64, 29 Cyc. 1375. It may be conferred by act of the legislature, as is usually the case, or exist by virtue of the common law, in those jurisdictions where the common law is in force, and no statute expressly or impliedly denies the right. In the latter case recourse must of course be had to the common law to determine the limitations upon, and extent of the right.

It therefore becomes necessary to examine the condition of the law in this jurisdiction in regard to the right of women to hold office. The Territory of New Mexico was organized by the Act of Congress of September 9, 1850. Section 6 of that act provides:—

"That every free white male inhabitant, above the age of twenty-one years, who shall have been a resident of said Territory at the time of the passage of this act, shall be entitled to vote at the first election, and shall be eligible to any office within said Territory; but the qualifications of voters and of holding office at all subsequent elections, shall be such as shall be prescribed by the legislative assembly; *Provided,* that the right of suffrage, and of holding office, shall be exercised only by citizens of the United States, including those recognized as citizens by the treaty with the Republic of Mexico, concluded February second, eighteen hundred and forty-eight."

The provisions of this section appear in R. S. U. S. of 1878, as sections 1859 and 1860, in somewhat different language, but in the view we take of the case such revised sections are of no importance in determining the issues involved herein.

By an act of the Territorial legislature, approved July 20, 1851, which will be found on page 196 of the Session Laws of 1851, a complete election law was enacted. Section 19 of the act defined the qualifications of voters and of holding elective office as follows:—

"Sec. 19. Every white male citizen of the United States, over twenty-one years of age, who shall have resided in the Territory one year, and in the county in which he offers to vote, for three months shall be entitled to vote and be elected to office in any election provided for in this act, unless in the cases hereinafter specified."

By this section it will be observed that the right to vote is limited to white *male* citizens of the United States, who possess the required qualifications as to residence. Likewise, by the section no one could be "elected to office, in any election provided for in this act," unless he possessed the required qualifications. Under this section a woman was debarred from voting and could not be elected to any office, at any election held under the act in question. Section 21 of the same act reads as follows:

"Section 21. No person prevented by the organic law of the Territory, no officer or soldier in the United States army, and no person included in the term 'camp followers' of the United States army shall be entitled to vote or hold office in this Territory." It will be observed that the latter section is broader in its scope than section 19. It denies the right to hold office, either elective or appointive, to any person "prevented by the organic law of the Territory." Section 19, insofar as it prescribed the qualification of voters, was evidently superseded by the registration law, which required all voters to be registered, and prescribed the qualifications required for registration, which will be found as sec. 1703, C. L. 1897, and permitting all registered voters to vote; sec. 1706, C. L. 1897, section 21, supra, however, was carried into the

compilation of 1897 in its original form, as section 1647. It will, therefore, be seen that sec. 19, of the original act is of no importance, in this case, except as an aid to the proper construction of section 21. Section 21, supra, was amended by chapter 21, S. L. 1907, and again by chapter 134, S. L. 1909. The amendment of 1907, need not be set out, as it is, insofar as material, in the same identical language as sec. 1, of chapter 134, S. L. 1909, which, insofar as pertinent, reads as follows:

"Sec. 1. No person prevented by the organic act of the Territory of New Mexico, * * * * shall be entitled to vote or hold public office in this Territory; * * * * ."

It will be observed that the original section used the term "organic law," whereas the amendment refers to the "organic act," thus clearly meaning the original Act of Congress, creating the Territory, and not the section of the Revised Statutes of 1878, hereinbefore referred to. It is evident, therefore, that we must look to the terms of the organic act to determine who were prevented from holding office, by its terms. It prescribes the right of suffrage and of holding office at the first election, and then provides that the qualifications of voters and of holding office at all subsequent elections shall be prescribed by the legislative assembly, and concludes with the following proviso: "*Provided,* That the right of suffrage, and of holding office, shall be exercised only by citizens of the United States, including those recognized as citizens by the treaty with the Republic of Mexico ,concluded, etc." From a reading of the section, it would appear to the legal mind that the proviso was a limitation upon legislative power and that it was intended to operate directly upon the right of suffrage. But in what light did the legislative assemblies regard the proviso when they referred to the limitations upon the right of suffrage and of holding office contained in section 21 of the original act and the amendments thereto? It is clear that they treated it as an independent section, and as a limitation upon the right itself, rather than a legislative limitation. The only limitations upon the right, or the only reference to the sub-

ject, in the organic act, are found in the section above quoted. It must be apparent that the legislature did not refer to the limitations upon the right of suffrage and of holding office at the first election, for to so hold would present insurmountable absurdities. For instance, at the first election the right was confined to "free white male inhabitants." Now is it to be presumed that the legislature in 1907 and 1909 would attempt to violate the Fifteenth Amendment of the Constitution of the United States, and the Act of Congress making such amendment applicable to territories? Again the section limits the right of suffrage and of holding office, at the first election to free white male inhabitants "who shall have been a resident of said Territory at the time of the passage of this act," consequently, should we hold that the limitations referred to,. were those prescribed for the first election, it would necessarily result that the legislature, as late as 1909 was attempting to deny the right of suffrage to all those, who were not residents of New Mexico in 1850. Such, of course, was never the intention, and, therefore, the legislature necessarily must have had in view the limitations contained in the proviso, and intended that the right of suffrage and of holding office should be exercised only by citizens of the United States, including those recognized as citizens by the treaty with the Republic of Mexico, etc.

"The Supreme Court of the United States, in Minor v. Happersett, 21 Wall. 162, has held that the word 'citizen,' as used in the Constitution and Laws of the United States,. has uniformly conveyed the idea of membership of a nation, and nothing more, and hence include either sex alike." Cronly v. City of Tucson, 56 Pac. 876, (Arizona.)

Hence, from a review of the statute law of the Territory, it will be seen that there was no express denial of the right of suffrage, or of holding office, to women, neither was the right granted in terms. In this connection it is to be remembered that the civil law of Spain and Mexico was in force in this Territory at the time of the original enactment by the territorial legislature, under which women had no such right as is contended for, and this re-

mained the situation until January 7, 1876, when the act was passed by the legislature, adopting the common law in this jurisdiction. This appears as section 2871, R. S. 1897, and reads as follows:

"In all the courts in this Territory the common law as recognized in the United States of America, shall be the rule of practice and decision."

There being no statute, either denying or conferring the right of suffrage and of holding office upon a woman, it is clear that we must look to the common law, if the above section adopted it in New Mexico, to ascertain and determine the right of women to vote and hold office. Under the common law, the right of women to vote, was, of course, never recognized, and such right is not involved in this case, but merely the right to hold an appointive office, which is purely ministerial. Before discussing the right of a woman to hold such an office, under the common law, it will be necessary to dispose of appellant's contention, viz.: That the civil law and not the common law, is in force here, except where modified by statute. In support of the contention, Ward v. Broadwell, 1 N. M. 85; Chaves v. McKnight, 1 N. M. 147; Ilfeld v. Baca, 14 N. M. 65, are cited and relied upon. The first two cases cited were decided long prior to the passage of the Act of January 7, 1876, and at the time such decisions were rendered the civil law was in force in New Mexico, except where changed by statute, or abrogated by the organic act. No such point was involved in the last case cited. On the other hand, as early as 1886, in the case of Browning v. Est. of Browning, 3 N. M. 659, the Supreme Court of New Mexico construed the above statute and held:—

"The legislature intended, by the language used in that section to adopt the common law, or *Lex non scripta,* and such British statutes of a general nature not local to that kingdom, nor in conflict with the Constitution or laws of the United States, nor of this Territory, which are applicable to our condition and circumstances, and which were in force at the time of our separation from the mother country."

This construction of the effect of the above statute has

been consistently adhered to by the courts of the Territory for more than a quarter of a century. (Territory v. Ashenfelter, 4 N. M. 93; Dye v. Crary, 12 N. M. 160; Sandoval v. Albright, 14 N. M. 345.)

Adopting the construction of sec. 2871, supra, in the Browning case as correct, it is, therefore, necessary to inquire into the right of a woman, under the common law of England, at the time of our separation from that country, to hold such an office as Librarian of the State Library. Before reviewing the common law, however, it would perhaps be well to consider the statutes of the Territory, creating the office and defining the duties of the librarian, in order to determine the nature of the office, for, as we shall later see, under the common law, women were only permitted to hold certain offices, and their right to so hold such offices depended, to a large degree, upon the nature and duties of the office.

The statutes relating to the Territorial library, the custody and management thereof, will be found under section 2187, to and including section 2215, C. L. 1897. Under said sections the management of the library is placed in the hands of a board of trustees, and said board is given the power to adopt rules for the conduct and management thereof. All books must be purchased by the board. The act defines the duties of the Territorial Librarian, which may be briefly summarized as follows: (a) Such librarian has the care and custody of the library, (b) is to keep same in a room in the Capitol building provided for that purpose, and to provide for the safe keeping therein of all things belonging or appertaining thereto, (c) has charge of all books, maps, etc., belonging to the library or directed to be deposited therein, (e) must keep the library open during certain hours, (f) not to permit books to be removed from the library, except by certain officials, and to take a receipt for all books removed, (g) to prepare an alphabetical catalogue of the library, (h) to label each book in the library in a specified manner, (i) to report to the Governor, when required, a list of books missing and the fines collected, and to report to the legislature, (j) to institute suit, in the name and use of the Territory, for the

recovery of certain penalties, for the unauthorized removal from the library of any books, etc. From a review of the statutes upon the subject it will be found that the librarian is not required to exercise his or her judgment in any respect. The duties are precsribed by statute or defined by rules adopted by the board of trustees. The office is purely ministerial.

"Ministerial offices, it is said, are those which give the officer no power to judge of the matter to be done, and which require him to obey some superior." State v. Loechner, 65 Neb. 814, 59 L. R. A. 115.

Under the statute in question, the librarian was required to conform to the rules adopted by the board of trustees. He was given no initiative as to any matter, or power to determine any question. He was to perform the duties prescribed by the act, and the rules of the board, in the manner directed.

"A ministerial act is defined to be 'one which a person performs in a given manner, in obedience to the mandate of legal authority, without regard to or or the exercise of his own judgment upon the propriety of the act being done.'" Formney v. Jefferson Vello, 17 Ind. 169, 79 Am. Dec. 468.

An officer, performing only ministerial acts, is, of course, only a ministerial officer.

The office, being purely ministerial, it remains to determine the right of a woman to hold such an office under the common law. From a review of the American cases, where the common law rights of women to hold public office have been considered, there appears to be a decided conflict of authority upon the subject. We have, however, been referred to no case, where the duties were so purely ministerial, in which the right to exercise the duties of the office have been denied to women.

In Opinion of Justices, 107 Mass. 604, the right of a woman to hold the office of Justice of the Peace was denied. But this office, under the Constitution of that State, was a judicial office, the duties of which must be exercised by the incumbent in person. The case cannot, therefore,.

be considered in point in this case, where the office is ministerial.

Again, in Lelia J. Robinson's case, 131 Mass. 376, the same court denied the right of a woman to be admitted as an attorney and counsellor of the court. The Court say:

"An attorney at law is not, indeed, in the strictest sense, a public officer. But he comes very near it. As was said by Lord Holt, 'The office of an attorney concerns the public, for it is for the administration of justice.'"

In the opinion, the Court evidently treats an attorney at law as an officer, and denies the right of a woman to be admitted thereto, because under the common law a woman was not permitted to hold any office that concerned the administration of justice, where she was required to exercise the duties of the office in person.

The same Court, later, in Opinion of Justices, 136 Mass. 578, held, that under the statutes of 1879, c. 291, sec. 2, which provided that the Governor, with the advice and consent of the council, should appoint nine persons, who should constitute a state board of health, lunacy, and charity, it was competent to appoint a woman member of the board. While the Court does not, in terms, base the right upon the common law, it does say:

"The duties of the board are mostly administrative, and are such as may well be performed by women. There is no incompatibility between the nature and character of the duties and their due performance by women," thus recognizing the common law limitations upon the right, and implying, that under the statute, a contrary doctrine would have been announced were the office under consideration one, which at common law, a woman would have no right to hold.

In an earlier case, the same Court, in Opinion of Justices, 115 Mass. 602, held, that under the Constitution a woman might be a member of a school committee. The Constitution was silent upon the question of the right, and the Court, in discussing the right of a woman to hold such an office, under the common law, say:—

"The common law of England, which was our law upon the subject, permitted a woman to fill any local office of

an administrative character, the duties attached to which were such that a woman was competent to perform them."

The Supreme Court of Michigan, in the case of Attorney General v. Abbott, 121 Mich. 540, 47 L. R. A. 92, 80 N. W. 372, held that a woman could not be elected to the office of prosecuting attorney, under an article of the Constitution of that State which provided that such officers shall be "chosen by the electors," in the absence of an express provision conferring the right to hold such an office on women. The Court say:

"There being no express provision of the Constitution or laws of the State conferring upon respondent the right to hold this office, the question must be determined by the principles of the common law, and the manner in which those principles have been construed in this State for the past years. * * * * There can be no question of the common law rule that a woman cannot hold a general public office in the absence of express constitutional or statutory authority conferring upon her such right."

The opinion of the Court was based chiefly upon the exposition of the common law right of women to hold office. By Chief Justice Gray, in Robinson's case, supra. It will be noted from the above quotation, that the Court say, that at common law, a woman could not hold "general public office." The Court does not undertake to define the meaning of "general public office," but it will be seen from the concurring opinion of Mr. Justice Hooker, that the Court had in view the disqualification of women under the common law, to hold general public office, connected with the administration of justice, where she was compelled to perform in person the duties of the office, calling for the exercise of personal discretion and judgment. The Justice says:—

"It remains to inquire whether the office of prosecuting attorney is such a ministerial office as to render a woman ineligible." Thereby implying that women would be eligible to hold certain ministerial offices, even though they might fall within the meaning of the term "general public office." Certainly the criterion, is not whether the office be a State, District or County office, for the Supreme Court

of Massachusetts, in the Opinion of Justices, 136 Mass. 578, recognized the right of women to be appointed to, and hold, the office of member of the State board of health, lunacy and charity, which clearly would make her a State officer. It would seem, that under the common law, a woman was not capable of holding a public office, connected with the administration of justice, or the legislative department of the government, for her powers could not be delegated and in either position she would be called to exercise judgment and discretion, and, it was generally supposed, in that period of the history of the world, when the common law had its birth, that women were incapable mentally of exercising judgment and discretion and were classed with children, lunatics, idiots and aliens insofar as their political rights were concerned, but we have been cited to no English case which denies the right of a woman under the common law, to hold a purely ministerial office, whatever might be the nature of the office, if she was capable of performing the duties thereof, and in so doing was not called upon to exercise judgment and discretion. The Michigan Court evidently recognized this distinction in the case of Attorney General v. Abbott, supra, for Justice Hooker says, in discussing the inquiry suggested as to the nature of the office of prosecuting attorney:

"That, I think, is settled by one of our own decisions, the case of Eagle v. Chipman, 51 Mich. 524, 16 N. W. 886. It was there held that a prosecuting attorney could not delegate his powers; that he was vested with a personal discretion as a minister of justice. He might perhaps employ assistants when authorized by law, but could not delegate his official discretion. It seems clear that this judicial discretion takes the office out of the class recognized by the common law, and the cases, both English and American, as within the right of women to hold."

Even in the above case, where the official was "vested with a personal discretion as a minister of justice," a strong dissenting opinion was filed by Justice Moore, wherein he contended that a woman was eligible to that office.

The Supreme Court of Oregon, In re Leonard's Applica-

tion to be admitted as an attorney, 12 Ore. 93, denied the right of a woman to be admitted as a member of the bar. The opinion was based entirely upon the Robinson case, supra. The Massachusetts Supreme Court denied the right of a woman to be appointed a notary public. See Women as Notaries Public, 6 L. R. A. 842; Opinion of Justices, 165 Mass. 599.

The New Hampshire Supreme Court, In re Opinion of Justices, 62 Atl. 969, 5 L. R. A. (N. S.) 415, denied the right of a woman to hold the office of notary public on the ground that the office was "public and governmental," and could not, at common law, be held by a woman.

On the other hand, many courts have recognized the right of women to hold various offices, where no statute or constitutional provision existed, either expressly or impliedly denying the right. Thus, in the case of Wright v. Noell, 16 Kan. 601, in an opinion by Justice Brewer, the Supreme Court of Kansas held that a woman in that State, was eligible to hold the office of Superintendent of Schools. Likewise, the Supreme Court of Washington announced the same doctrine in the case of Russell v. Guptill, 13 Wash. 361. The Supreme Court of Indiana, in the case of In re Leach, 134 Ind. 665, held that a woman could be admitted to practice law. As did the Supreme Court of Connecticut ,in the case Matter of Hall, 50 Conn. 131. The Indiana Court say:—

"We have searched in vain for an expression from the common law excluding women from the profession of the law."

The Supreme Court of Michigan, in the case of Wilson v. Newton, 87 Mich. 493, held that a woman could be appointed deputy County Clerk, as the office of County Clerk was wholly ministerial. A woman was held eligible to election as County Clerk, under a constitutional provision, which provided that no person shall be chosen to an office, "who is not a citizen of the United States, and who shall not have resided in this State one year." State, ex rel. Crow, v. Hostetter, 137 Mo. 636, 38 L. R. A. 208.

The Supreme Court of Nebraska, in the case of State, ex rel. Jordan, v. Quible, 86 Neb. 417, 125 N. W. 619, 27

L. R. A. (N. S.) 531, held that a woman was eligible to the office of County Treasurer.

The Court say:—

"No constitutional or statutory provision inconsistent with the right of a woman to hold that office has been found. A familiar legislative enactment, however, adopts 'so much of the common law, of England as is applicable, and not inconsistent' with the Federal and State Constitutions and the statutes of this State. This Court, in its early history, announced that the common law thus adopted permitted women to hold office administrative in character, the duties of which they were competent to discharge." See also Opinion of Justices, 57 Southern, 351, (Fla.) Exhaustive notes on the right of women to hold office generally will be found appended to the cases of State, ex rel. Crow, v. Hostetter, 38 L. R. A. 208, and State, ex rel. Jordan, v. Quibble, 27 L. R. A. (N. S.) 531. From a review of the cases it will be found that the courts in this country are by no means agreed upon the rights of women under the common law to hold office. The right, as to many offices, has has been denied by some courts and upheld by others. We do not believe, however, that an American case can be found expressly denying the right of a woman to hold a purely administrative, ministerial office, such as the one here in question. On the other hand, many cases affirm their right to hold offices, even where judgment and discretion must be exercised by the incumbent. A review of the English cases will show that women have held many important offices in that country, some by appointment, others by inheritance. Her right to hold a purely ministerial office, so far as we have been able to ascertain, was never denied by the English courts, and her eligibility to judicial office sometimes was made to depend upon whether the duties of the office could be performed by a deputy. Eleanor was appointed Lord Keeper of England. 1 Campbell, L. L. Ch. 134. An unmarried woman was held to be eligible to appointment as arbitrator, 8 Edw. 4; 1 Br. 37. A woman was chosen sexton, by election, and her right to the office upheld; Olive v. Ingram, 2 Str. 1114.

In King v. Stubbs, 2 T. R. 395, it was held that a woman could be elected to and hold the office of overseer of the poor. Counsel, in arguing against the right, said:—

"Wherever it is said that a woman may hold any particular office, it is either because the office is ministerial, or because, though partly judicial, it is hereditary, and then she may appoint a deputy."

The Court say:

"The only question then is, whether there be anything in the nature of the office that should make a woman incompetent and we think there is not. There are many instances where, in offices of a higher nature, they are held not to be disqualified; as in the case of the office of High Chamberlain, High Constable and Marshal; and that of a common constable, which is both an office of trust, and likewise, in a degree judicial. So in the case of the office of sexton."

Other English cases will be found cited in the note in 38 L. R. A. 208, and note to Schuchardt v. People, 39 Am. R. 34. We shall not attempt to review them all. The common law rule upon the subject, deducible from the cases, may be stated as follows:—that while women did not generally hold public office, and the question of their competency was not well settled, they did hold various offices, some of which were of great importance; some were appointive and some hereditary; that their right to hold a purely ministerial office was never denied, and has been upheld; that they were ineligible to hold any office, which called for the exercise of judgment and discretion, unless the duties of the office could be exercised by deputy, it being generally supposed that women, from the nature of the sex, and their inexperience, were incapable of exercising that judgment and discretion which was necessary to properly discharge the duties of the office. Another con sideration was, that there must be incompatibility between the nature and character of the duties of the office and their due performance by women; if the duties of the office could be performed by a deputy she was held capable of holding the office. It is worthy of note, as stated by the Annotator of the case note, in 38 L. R. A. 208, "That in every in-

stance in which a woman's right to any office was questioned, prior to the present generation, she was held to be competent, although the courts often took occasion to say that women were not competent to hold all offices."

The office of State Librarian is clearly such an office as a woman might hold under the common law of England, at the time of our separation from that country. The office is purely ministerial and called for the exercise of neither judgment nor discretion, and the duties of the office are not incompatible with the ability of a woman to perform.

Another argument, were it needed, might be advanced in favor of such a construction of the law by the courts, viz:—the long-continued executive construction of the law upon the subject. Since the year 1905, the Governor, in whom, by the act creating the Territorial library, the appointing power was vested, has uniformly appointed women to fill this office. Such appointments have been confirmed by the legislative council of the Territory without question as to the right of a woman to fill the office. Governor Otero, in 1905, appointed Mrs. Anita Chapman as librarian, and she was promptly confirmed by the council. The present incumbent was twice appointed to the office by Governor Curry, and the present Governor of the State nominated a woman for the office, whose appointment, however, failed of confirmation by the senate, but not because of the fact that the appointee was a woman. Other instances might be cited where the executive authority of the Territory recognized the right of women to fill various offices. Women were appointed notaries public, and served without question, even prior to the Act of 1909, which distinctly authorized their appointment. The people, in various parts of the State, have elected women to the office of County Superintendent of Schools, and their right to hold such offices has never been questioned. The Supreme Court of the Territory, in 1908, admitted a woman to practice law in the Territory, and twenty-five years ago a woman was admitted to the bar at Las Vegas. The people of the Territory, the chief executive of the Territory, and the courts, have long recognized the right of women

to hold various offices and the office in question having been acceptably filled for many years by women, it is clear that this Court should not oust a woman from the office, because of her sex solely, unless it is clearly and unmistakably demonstrated that she holds the office without right or lawful authority. The most that can be said against her right to so hold, is that the statute does not, in terms, make her eligible. This is true, but on the other hand it does not deny such right. Under the common law, no case has been cited denying the right of a woman to hold the particular office in question, nor, on the other hand, have we found a case affirming the right. But on principle, deducible from the old English cases, we are of the opinion, that under the common law she could have held the office, and no statute of the Territory denying her the privilege, she was rightly in office at the time of the adoption of the State Constitution.

But it is insisted, that the right to hold· the office is a political right, which was not carried into the law of the Territory by the statute adopting the common law of England. It is sufficient answer to this contention to say, that we adopted all of the common law, or Lex non scripta of England and such British statutes as were of a general nature and not local to that kingdom, in force at the time of our independence, in so far as the.same did not conflict with the Constitution or laws of the United States and the organic act of the Territory and the legislative enactment thereof, which were applicable to our conditions and circumstances and our form of government. Many of the political rights recognized by the common law were in conflict with our customs and institutions and not suited to our conditions and, of course, were not brought into our law, but such as were recognized by the common law, and not in conflict with our established laws, institutions and customs, and suitable to our conditions, were, of course. carried into the body of our law. That the common law is applicable to the question involved in this case, in the absence of a statute upon the subject, has never been denied by an American court, even in those cases which denied woman the right to hold office.

State v. Armijo, 18 N. M. 646.

It is also suggested, that at the time of the adoption of the common law, the legislature did not have in view, or contemplation the fact that a woman would claim the right thereunder to hold office. This is doubtless true. But it is also probable that the question was not considered by the legislature. This can be no argument against the right of a woman to hold office under that law. Since the adoption of the common law in New Mexico, it is as much the rule of decision in this State, as in those States in which it was the law from the beginning of their political existence. Swayne v. Lone Acre Oil Co., 98 Tex. 597. Again, innumerable rights, privileges and immunities were conferred, recognized, protected, preserved and enforced by the common law, and it is hardly imaginable that the legislative assembly when it adopted the common law in the Territory, had in mind each particular right or privilege which would be claimed under that law. The legislature adopted it all, to the extent hereinbefore stated, and the courts will not deny a right asserted under that law, on the ground that the legislature did not have the particular right or remedy in view at the time of the adoption of the law.

The question as to the right of a woman to be appointed to such an office under the Constitution of the State, is not involved in this case. It is conceded that if the present incumbent was rightfully in office, at the time of the adoption of the Constitution, she was continued in office by virtue of sec. 9, article XXII, of the Constitution, which provided:—

"All courts existing, and all persons holding offices or appointments under authority of said Territory, at the time of the admission of the State, shall continue to hold and execute their respective jurisdictions, functions, offices, and appointments until superseded by the courts, officers, or authorities provided for by this Constitution."

This clause was for the purpose of continuing in office those legally entitled thereto at the time of the adoption of the Constitution, until succeeded by their successors, appointed or elected according to law. It did not, of course, divest the courts of the power given them by law

to remove officers for the causes prescribed by law, or to oust intruders from such offices. If the appellee was rightfully in office at the time of the adoption of the Constitution, she was continued therein by the above clause, until her successor was appointed and qualified, according to law, subject only to removal for legal cause prior to that time.

Appellee, rightfully holding the office at the time of the adoption of the Constitution, was entitled to retain the office at the time of the institution of this suit, and the judgment of the lower court sustaining the demurrer to the information will be sustained, and it is so ordered.

## CONCURRING OPINION.

PARKER, J.—I have had great difficulty in agreeing with some of the propositions upon which the opinions of my associates are based. Upon first examination of the case, I was convinced that women were prohibited from holding office by reason of the condition of the statute law on the subject. My conclusion was reached as follows:—The organic act prescribed the qualification of voters and office holders at the first territorial election, and limited the same to males, thereby excluding females; it granted power to the legislature to prescribe the qualification of voters and office holders for the future, but restricted the power so that only citizens of the United States might receive the right; the legislature at its session in 1851 prescribed the qualification of electors and elective office holders, and limited the same to males; it further restricted office holding generally to such persons as were not prevented by the terms of the organic law. This was the state of the specific statute law on the subject at the time appellee was appointed as Territorial Librarian.

As a conclusion from the foregoing facts, I was of the opinion that Congress in the organic act, and the Territorial legislature in its acts on the subject, having extended these rights to males only, when dealing with the subject, should be held, under the doctrine of *expressio*

*unius est exclusio alterius,* to have, in legal contemplation, denied these rights to women, as effectually as if the denial had been express; that this denial of the right to women, being specific, and in a statute dealing specifically with this subject, it was not controlled by the Act of 1876, which was a statute of a most general character, and which adopted the common law as the rule of practice and decision in this jurisdiction, and did not purport to deal specifically with the right to hold office. This position was disclaimed by counsel for the State on re-argument and, after repeated conferences and discussions with the other members of the Court,, and upon more mature consideration, I am convinced that this conclusion is not warranted.

In this connection it is to be noted that there is no express grant of a right to hold appointive office in either the organic act or the Territorial legislation to either males or females. Section 19 of the Act of 1851 is complete on the subject of the right to vote and hold elective office, and it follows perfectly the restriction contained in the organic act. Section 21 of the Act of 1851 must, therefore, be held to relate to offices other than elective offices; otherwise its provisions are meaningless and unnecessary, being fully covered by the provisons of section 19, insofar as the restriction to citizens of the United States is concerned. It must, therefore, relate to appointive offices. This section is negative in form and would appear to be a limitation upon, rather than a grant of, the right to hold office. But while negative and restrictive in form, it is permissive, at least, if not positive and creative in substance. The section prohibits aliens from holding appointive office, but impliedly authorizes citizens of either sex, to hold such office. If the legislature of 1851, in the exercise of the powers conferred by the organic act, had simply provided that "no person not a citizen of the United States shall vote or hold office," the implication would be irresistible that it intended thereby to grant that right to citizens. Just so in the present case. It provided that no person not a citizen, (that is, no person prohibited by the organic law) might hold appointive office, thereby impliedly granting that right to citizens. Women are, of

course, included in the words "citizens of the United States."

When the Governor was authorized to appoint a State Librarian under section 2195, C. L. 1897, what class of person was he authorized to select? The act creating the office furnished no answer. The one other provision on the subject is section 21 of the Act of 1851, which excludes aliens, and impliedly, includes citizens, among whom, of course, are women. If express statutory authority is necessary to confer the right to hold appointive office, where is the authority for men to hold such office except as contained, impliedly, in section 21, supra. It does not exist otherwise.

In Barker v. The People, 3 Cowen, 686, 15 A. D. 322, in discussing who may hold office, this significant statement is made:

"The Constitution giving the right of election and the right of appointment, these rights consisting essentially in the freedom of choice, and the Constitution also declaring that certain persons are not eligible to office, it follows from these powers and provisions that all other persons are eligible. Eligibility to office is not declared as a right or principle by any express terms of the Constitution, but it results as a just deduction from the express powers and provisions of the system. The basis of the principle is the absolute liberty of the electors and the appointing authorities to choose and to appoint any person who is not made ineligible by the Constitution. Eligibility to office, therefore, belongs not exclusively or specially to electors enjoying the right of suffrage. It belongs equally to all persons whomsoever not excluded by the Constitution."

As applied to the appointment of a woman as a deputy to perform ministerial duties, the Supreme Court of Michigan, in Wilson v. Newton, 87 Mich. 493, 24 A. S. R. 173, said:

"The office of County Clerk is wholly ministerial, and when the law provides that a ministerial officer may appoint a deputy, for whose acts he and his sureties are responsible, and does not limit or restrict him as to whom he appoints, he has authority to appoint whomsoever he

pleases. The person appointed acts for him; or in other words, he acts through his deputy. His choice is not confined to any race, sex, color or age."

It may occur to the mind that if this position be correct, then infants may hold appointive office. It would appear at first glance that such could not be the case, but an examination of the law discloses that infants at common law, and here, unless expressly excluded by statute or Constitution, may hold any ministerial office not connected with the administration of justice. 22 Cyc. 515; U. S. v. Bixley, 9 Fed. 78; Harkreader v. State, 35 Tex. Cr. 243, 60 A. S. R. 40, collecting cases.

It may be suggested that the statutes heretofore mentioned taken in connection with the civil law, which was then in force, would exclude women from holding appointive office, at least until the civil law was superseded by the Act of 1876, which brought in the common law. I do not agree to the suggestion. Of course, ordinarily, the laws of a country acquired by conquest remain in full force until superseded by the laws established under the new government, and they are superseded only to the extent to which the laws of the new sovereignty are antagonistic thereto. But in this case, while the civil law denied such rights to women, the congress established a new form of government, and the legislature established a new system of political and governmental rights. Under such circumstances the laws of the former jurisdiction relating to such rights, must necessarily be held to have been directly or impliedly repealed.

It would seem, therefore, that there is implied statutory authority for women to hold appointive office.

I am aware that the rule of interpretation above mentioned, is to be applied with caution, and only when the act is creative of a right rather than merely declaratory, or limitative of a right. But it seems to me that in this case, the legislative intent to grant the right to all citizens to hold appointive office is manifest, and the application of the rule of interpretation above mentioned is justified and required.

Counsel for the State rely upon two propositions: First,

there is no statutory grant to women of the right to hold appointive office. This contention has been disposed of. Second, the common law, which was adopted by the Act of 1876, clearly excludes a woman from such an office as State Librarian. With the latter contention of counsel I cannot agree. If this question had arisen in England, just prior to the separation of the Colonies, I feel convinced that the right of a woman to hold this office would have been upheld. The question at common law, in case of appointive offices, was whether the office was ministerial and, consequently, did not involve the exercise of judgment or discrteion, of which women were not supposed to be possessed. If so, a woman could be appointed to and hold the same, if it was not unsuited to her ability to perform its duties. This office is a ministerial office. Not a single duty exists which is not subject to control by either the board of trustees of the library, or the letter of the statute creating the office. Nothing is left to discretion. The restriction to local officers by the Massachusetts Court in 115 Mass. 602, is engrafted on the law, and is not warranted by the English cases.

For the raesons stated, I concur in the result reached by Judge Roberts.

### DISSENTING OPINION.

HANNA, J.—I find I cannot concur in the majority opinion of the Court in its conclusion that under the common law a woman was eligible to hold a purely ministerial office, if she was capable of performing the duties thereof and was not called upon to exercise judgment and discretion.

My reasons therefor are: First, that the right to hold office under our political system is not a natural right, but exists only because and by virtue of some law expressly or impliedly creating or conferring it. Mechem on Public Officers, sec. 64. And it has been held that women, although citizens of the United States in the broad sense have, under our political system, no political power, and cannot, except under an enabling statute, be considered eligible to hold office.

Minor v. Happersett, 21 Wall. 162; Mechem on Public Officers, sec. 73.

This is doubtless the law of the case, unless our legislature by the adoption of the common law, (sec. 2871, C. L.) as the rule of practice and decision in our courts, have enlarged the right so far as women are concerned. Can it, therefore, be said that the right to hold an office, such as the one in question, had been conferred upon women by the common law, assuming for the present that if the right existed, as a common law right, and our Constitution or legislation did not prohibit it, a woman may hold the office under consideration.

Our inquiry is made a difficult one by reason of the fact that no office similar to the one under consideration, i. e., librarian, was ever referred to in the English reports; so we will give a general consideration to the early English cases, where the right of a woman to hold office was considered.

The cases, decided prior to April 21, 1788, are collected in the case of Rex v. Stubbs, reported in 2 T. R. (D. & E.) 395. It was there contended by counsel that "woman is capable of serving almost all of the offices in the kingdom; such as those of queen, marshal, great chamberlain, and constable of England, the champion of England, commissioner of sewers, governor of the workhouse, sexton, keeper of the prison, of the gate house of the dean and chapter of Westminster, returning offices for members of Parliament, and constable, the latter of which is in some respects judicial." Opposing counsel contending as follows:

"With respect to all the instances cited in which women have served other offices; no argument whatever can be drawn from them to show that a woman is competent to serve this office, there being not the least similarity between the nature of the respective offices. As to the Queen of England, it is sufficient to say, that of all other stations, there is not one perhaps which requires less personal exertion than this. And it was even doubted whether the regal office in this kingdom was hereditary in a female. In consequence of which the statute 1 M. St. 3, c. 2 was passed, purposely to declare that a female was capable of inherit-

ing. The reason why a female may hold the office of constable of England, is because she may appoint a deputy; now that reason is an admission that if she could not appoint a deputy she could not hold the office. The same reason is given why Lady Russell might hold the office of the custody of the castle of Dunningham, because the office was granted to be exercised *per se vel deputatum suum.* Cro. Jac. 18. So the offices of great chamberlain, marshal, and champion of England, are hereditary; they are granted to a man and his heirs. With respect to the instance of a commissioner of sewers; it is merely an opinion of Callis, for which he gives an absurd reason, that Semiramis governed Syria. As to the case of the sexton, which is said to be only a private office of trust, to take care of the church, etc., and therefore a woman may serve it; it is also said there, that if there were any thing to be done by the sexton, not proper for a woman, it would be otherwise. With respect to the case of the constable, it is only the opinion of Serjeant Hawkins, that a custom to serve by rotation is good, because he thought that a woman might procure a deputy; now this admits that she cannot serve in person; and if she cannot serve by deputy, the custom could not be supported. In answer to these cases, it is not necessary to consider how far they are authorities to show that in certain cases a woman may appoint a deputy, but for this part of the argument it is sufficient if they prove the incompetency of females to serve those offices in person. Wherever it is said that a woman may hold any particular office, it is either because the office is ministerial, or because, though partly judicial, it is hereditary, and then she may appoint a deputy. So a woman, who is a forester in fee, cannot execute the office herself, but she may appoint a deputy, the office being ministerial. The incompetency of women extends to a variety of cases; they cannot serve on juries; vote for members of parliament; in particular, the case in 16 Vin. Abr. 415, is decisive to show that a woman is incompetent to serve it. There a woman was rejected as unfit; and Powell, Jr., said, 'a woman cannot be an overseer of the poor, and there can be no custom of the parish to appoint her, because it is an of--

fice created by act of parliament.' Secondly, an officer, who acts merely ministerially, may appoint a deputy but a judicial officer cannot; neither can a deputy be appointed where the office is (strictly speaking) neither ministerial or judicial, but an office of trust and discretion and the office of overseer of the poor is of that description. It is said in Bro. Abr. tit. Deputie, pl. 9.—tit. Graunt, pl. 108.—tit. Patent, pl. 66, and Sir W. Jones, 113, that an office of trust cannot be assigned; neither can it be executed by deputy, unless power be expressly given for that purpose. Co., Litt. S. 379. A steward cannot appoint a deputy without power. 9 Co. 48. Nor the clerk of the papers. Freem. 429. The office of high constable of England is expressly granted to be exercised by himself, or his sufficient deputy. And the offices of earl marshal, great chamberlain, and the champion of England, are hereditary; that they are to the grantees and their heirs; so that according to the terms of those grants power is given to appoint a deputy. All of the offices mentioned on the other side (except one) are either ministerial or hereditary; in both which cases a deputy may be appointed. The instance indeed of a constable's appointing a deputy, if it be the law, forms an exception to the general rule."

In the Stubbs case the office involved was overseer of the poor, it being contended that in the Stat. 43 Eliz., c. 2, prescribing that the office should be served by "substantial householders," there was no reference to sex, and the defendant, Stubbs, a woman, was eligible to appointment. The Court disposed of the question in the following language:

"As to the second objection, we think that the circumstance of one of the persons appointed being a woman does not vitiate the appointment. The only qualification required by Eliz. is that they shall be substantial householders; it has no reference to sex. The only question, then, is whether there be anything in the nature of the office that should make a woman incompetent? and we think there is not. There are many instances where, in offices of the higher nature, they are held not to be disqualified; as in the case of the office of high chamberlain, high constable,

and marshal; and that of a common constable, which is both an office of trust, and likewise, in a degree, judicial; So in the case of the office of sexton. As to the case in Vin. tit. Poor. 415, that is no conclusive authority. It is to be collected from the case that there were other persons in the parish proper to serve; and if so, the Court held that the justices had not acted improperly in refusing to approve of a woman; where there are a sufficient number of men qualified to serve the office, they are certainly more proper; but that is not the case here, and therefore, if there be no absolute incapacity, it is proper in this instance from the necessity of the case. And there is no danger of making of making it a general practice; for as the justices are invested with a discretionary power of approbation, it is not likely that they will approve of such an appointment when there are other proper subjects."

So that we find that the English courts had not affirmatively determined the rights of women in the matter of the holding of office, in 1788.

In the Stubbs case, while the woman was conceded to be a substantial householder, and as a result came within the terms of the statute, the Court said it was proper that she serve "from the necessity of the case," and that "there is no danger of making it a general practice."

Turning to the American cases in which the common law was considered as affecting the rights of a woman to hold an office, we find a conflict of opinion. Our inquiry is necessarily limited to those States where the power to hold office has not been conferred expressly upon women by Constitution or statute. It has been held that a woman cannot hold a judicial office, i. e., that of Justice of the Peace. Opinion of the Justices, 107 Mass. 604.

The reason assigned in this case was that the office was a judicial one and must be exercised by the officer in person, and a woman, whether married or unmarried, cannot be appointed to such an office. In a later opinion from the same Court, the Court said:

"The common law of England, which was our law upon the subject, permitted a woman to fill any local office of an administrative character, the duties attached to which

were such that a woman was competent to perform." Opinion of the Justices, 115 Mass. 602.

This opinion of the Court was announced without citing authority, and would be of some importance in determining what the common law, upon the subject, has been interpreted to be, by American courts, had not the same court in a later opinion (Robinson's case, 131 Mass. 376) which carefully considered all the English authorities, arrived at a somewhat different conclusion. It is unnecessary to quote at length from this opinion, which is a careful review of the English cases and authorities, and I will only quote the conclusion reached, in the following language:

"And we are not aware of any public office, the duties of which must be discharged by the incumbent in person, that a woman was adjudged to be competent to hold, without express authority of statute, except that of overseer of the poor, a local office of an administrative character, in no way connected with judicial proceedings. The King v. Stubbs, 2 T. R. 395."

As to the one exception referred to by the Massachusetts Court, in this opinion, we have observed that the English Court based its decision upon the necessity of the case and that the statute, impliedly at least, by fixing the qualification of "sugstantial householders," had conferred the right to fill the office upon women, by legislative grant.

The Court of Appeals of Kentucky, in the case of Atchison v. Lucas, 83 Ky. 465, said: "At common law, a woman could not hold any public office," and denied to a woman the right of filling the office of jailor. The Court further said in this decision:

"We do not mean to adjudge that offices of legislative creation may not be filled by women, or the right of suffrage granted them in certain cases; but, on the contrary, such rights may be conferred."

By the statements, quoted, the Court clearly took the position that the right to hold office was to be controlled by legislation creating, or conferring the right, and in the absence of enabling legislation must be considered as withheld, and further that no right arose by virtue of the com-

mon law. This may seem to conflict with the English cases, referred to, where women filled certain offices, through deputies, but the very fact that her right was so limited to offices where she might appoint a deputy would indicate that otherwise she did not possess the right.

So we find the rule proclaimed in Comyns' Digest, vol. 5, p. 202, under title "Grant of an Office," (B2) as follows:

"To a woman: (What offices a woman may execute;) So, the grant of an office of government, which may be exercised by a substitute or deputy, to a woman, will be good; as a woman may be made regent of the kingdom. Cal. 201."

Likewise in Ohio, it was held, that in the absence of constitutional or statutory provision on the subject, a woman could not hold the office of director of a workhouse. State v. Rust, 4 Ohio Cir. Ct. 329.

It is also contended that the Massachusetts Court in "Opinions of the Justices," 136 Mass. 578, recognized a woman's right to serve as a member of the board of health, lunacy an dcharity because the duties of the board are mostly administrative and are such as may well be performed by a woman, thus recognizing what it is contended are the common law limitations upon the right of woman to fill an office.

I cannot agree with this contention. The Court simply passed upon a statute providing that the board should consist of nine "persons" appointed by the Governor and held that "the word 'persons' clearly included women." This Court expressly referred to its previous decision in Robinson's case, (131 Mass. 376) and said that there was no conflict between the two cases. The distinction between the two is obvious, the one being based upon the common law of the subject (Robinson's case) and the other upon the construction of a statute plainly intending to continue women as qualified incumbents for positions, which by previous legislative enactments women had been designated as qualified to fill.

The New Hampshire Supreme Court, in a case involv-

ing the question of the right of a woman to fill the office of notary public, said:

"Because of our common law women are disabled from holding public office, and because the place of notary public is a public governmental office, and because we are unable to find any evidence of legislative purpose or intention to change the common law of this State in this respect, if such power exist, a point not considered, we are compelled to answer in the negative the question submitted." Re Opinion of Justices, 62 Atl. 969, 5 L. R. A. (N. S.) 418.

The rule laid down in this case is the prevailing doctrine in this country upon the subject, as applied. to the office of notary public.

It may be argued that the office of notary public is a judicial one, but the reasons assigned for the disqualification of women is not put upon that ground.

It has been held in Massachusetts that none of the acts which a notary is called upon to perform are judicial, but that the office is a public one, the duties of which must be performed personally and cannot be performed by deputy. Women as Notaries Public, 6 L. R. A. 842.

In the Michigan case of Attorney General v. Abbott, 121 Mich. 540, 47 L. R. A. 92, 80 N. W. 372, it was stated as the opinion of the Court, by Long, J., that:

"There can be no question of the common law rule that woman cannot hold general public office in the absence of express constitutional or statutory authority conferring upon her such right."

It is argued that because Hooker, J., in a special concurring opinion, in the Michigan case, conceded that there were instances "where it had been held that they (women) could hold local offices of little importance, where the duties were wholly ministerial," is was to be implied that women could be eligible to hold certain ministerial offices, even though they might fall within the term "general public office."

This is a legitimate argument to be drawn from the opinion, but I believe that a careful consideration of this opinion better justifies a different conclusion. In commenting upon those instances of "local offices" ministerial in nature

and of little importance, which women had held, Justice Hooker said:

"But while these cases support the claim that women might hold some offices, they reinforce the authorities which deny the general right contended for here."

The right contended for was "that inasmuch as the Constitution is silent upon the subject of the qualifications requisite to this office, we must recognize the right of everyone to hold it."

It is worthy of note that the opinion in this case, while apparently pointing out that local ministerial offices of little importance had been held by women, did not give any authority as a basis for the conclusion that such statement might be the rule of common law. We are more inclined to believe that the common law rule is correctly stated by the editor of the note to the case of State v. Hostetter, (Mo.) reported in 38 L. R. A. 208, at 215, in the following language:

"It may be said to be the general doctrine now held both in England and America that women are ineligible to any important office except when made so by enactment. It is usually said that this is the common law of the subject."

It is also argued that many courts have recognized the right of women to hold various offices, where no statute or constitutional provision existed denying the right. The Hostetter case, 137 Mo. 636, 38 L. R. A. 208, is cited as an instance. It is to be found, however, in this case that the Supreme Court of Missouri had under consideration a statute defining the qualifications for the particular office, among other things, to be that of citizenship of the United States, and a former statute, with respect to the same of had previously provided that the citizenship should be restricted to "free white male citizens." The Court said:

"The dropping of the word 'male' in describing the qualifications for such offices, has value as a guide to the legislative purpose in enacting the present law on this subject."

The effect of the opinion was to hold that the legislature intended to remove the disqualification, and qualify wo-

men for this office, which, in passing, it is worthy of note, was held to be a ministerial office, admitting of the use of a deputy and the duties of which were said to be not of such a nature as to be incompatible of discharge by a woman.

A legislative intent to make women eligible was looked for and found by this Court. I do not disagree with this view but consider that it is for the legislature to grant the right or withhold it, within constitutional limitations, and that the alleged common law rights have not been so definitely defined as to be worthy of consideration as sufficient rules now to be applied.

Wright v. Noell, 16 Kan. 601, is another case cited in support of the rule, last referred to. Justice Brewer in this case based his opinion upon the rule announced by the Supreme Court of Massachusetts, (Opinion of Justices, 115 Mass. 602), which Court, a few years later in a lengthy opinion reviewing all of the English authorities (Robinson's case, 131 Mass. 379), materially qualified its opinion

The Washington case of Russell v. Guptill, 13 Wash. 361, followed the Kansas case (16 Kan. 601), and Massachusetts case (115 Mass. 602.) In re Leach, 134 Ind. 565, and In the Matter of Mary Hall, 50 Conn. 131, are cases involving the construction of statutes, and in each case it was held that the term "persons" used in the statute, necessarily included women.

The case of Wilson v. Newton, 87 Mich. 493, was also cited, but is not in point and only declared and affirmed the common law rule (2 Bl. Com. 36) that a ministerial officer may appoint a deputy and, that under a statute, which was silent as to qualification of deputies, his choice was not limited to any race, sex, color or age.

The case of State v. Quibble, 86 Neb. 417, 125 N. W. 619, 27 L. R. A. (N. S.) 531, is also cited, but this as well as all the other American cases, which seem to be in point, relies upon the Massachusetts case (115 Mass. 602.) An earlier case in Nebraska, Crosby v. Cones, 15 Neb. 444, followed the Massachusetts case, and the later case followed the earlier one without question or consideration of authority.

After a careful consideration of the English and American cases, I conclude as follows: That, if there was any common law rule defining the rights of women, in the matter of holding public office, it was so indefinite and uncertain as to be of no value in sustaining a contention that our legislature adopted it and put it into force by adopt· ing the common law. It is apparent that the women of England had, prior to 1776, asserted rights to public offices in a few instances, but as stated by the Massachusetts Supreme Court, no case is to be found, prior to 1776, where any public office, the duties of which must be discharged by the incumbent in person, that a woman was adjudged by the English courts to be competent to hold without express authority of statute. This being true, it would seem to be for the legislature to enlarge the rights of women, which our recent legislature has done, (chap. 60, S. L. 1913) by providing that women may hold any appointive office in this State. Can we properly hold that she had the right prior to this legislation of 1913? In doing so, I believe we invade the province of the legislature.

It may be said that the office of State Librarian is one that permits of the appointment of a deputy and is therefore not within the application of the limitations herein pointed out.

It is true that the Librarian has a right to appoint a deputy in instances specified by the statute, but the limitation of such right would preclude any general power to so appoint. I cannot concur in the opinion that importance is to be attached to the executive construction referred to in the majority opinion, because I believe that no statute attempting to define the rights of women to this, or other similar office, is involved, and that the right was not declared by the common law, therefore, the right fails to exist because never granted, and there can, therefore, be no law to construe. The so-called executive construction has doubtless grown up under the assumption that there being no prohibition, there was no disqualification, entirely overlooking the principle, enunciated by Mr. Mechem, that the right to hold a public office under our political system

is not a natural right, and exists, where it exists at all, only by virtue of some law expressly or impliedly creating and conferring it. Mechem on Public Officers, sec. 64.

For the reasons indicated, I dissent.